Acuity Mutual Insurance Company,
Plaintiff-Appellant-Petitioner,

v.

Miguel A. Olivas, Defendant-Respondent.

Supreme Court

*No. 2005AP685. Oral argument September 12, 2006.
—Decided January 25, 2007.*

2007 WI 12

(Also reported in 726 N.W.2d 258.)

For the plaintiff-appellant-petitioner there were briefs by *Samuel C. Wisotzkey, Jordan B. Reich,* and *Kohner, Mann & Kailas, S.C.,* Milwaukee; *William R. Sachse, Jr.,* and *Peterson, Johnson & Murray, S.C.,* Milwaukee, and oral argument by *Samuel C. Wisotzkey.*

For the defendant-respondent there was a brief by *Ness Flores, Paul Bugenhagen, Jr.,* and *Flores & Reyes,* Waukesha, and oral argument by *Ness Flores.*

An amicus curiae brief was filed by *James A. Friedman, Jennifer Cotner,* and *LaFollette Godfrey & Kahn,* Madison, on behalf of The Wisconsin Insurance Alliance and The Wisconsin Compensation Rating Bureau.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of a published decision of the court of appeals affirming a judgment of the Circuit Court for Sheboygan County, James J. Bolgert, Judge.[1] The circuit court ruled that the workers at issue satisfied the nine-part test for independent contractors set forth in Wis. Stat. § 102.07(8)(b) (2003–04) of the Worker's Compensation Act (the Act).[2] Accordingly, the circuit court dismissed Acuity Mutual Insurance Company's complaint against Miguel Olivas, holding that Olivas did not owe additional premiums for his worker's compensation insurance policy.

¶ 2. The court of appeals affirmed the order of the circuit court, basing its decision on different reasoning. According to the court of appeals, Acuity Insurance presented a "garden-variety breach-of-contract claim."[3] Consequently the court of appeals applied common-law criteria to distinguish between independent contractors and employees and concluded that Acuity Insurance failed to demonstrate that the workers at issue[4] were employees rather than self-employed contractors under the common law.

---

[1] *Acuity Mut. Ins. Co. v. Olivas,* 2006 WI App 45, 289 Wis. 2d 582, 712 N.W.2d 374.

[2] All references to the Wisconsin Statutes are to the 2003–04 version of the statutes unless otherwise noted.

[3] *Olivas,* 289 Wis. 2d 582, ¶ 14.

[4] The word "workers" and the phrase "workers at issue" are used to refer to the men working on the Tenpas jobs with Olivas; the phrase does not usually include Olivas.

¶ 3. This case is not a traditional worker's compensation case in which the parties disagree whether an injured applicant qualifies for worker's compensation. This is a dispute between an insurance company and a policyholder about the calculation of the premium for the worker's compensation insurance policy.

¶ 4. This review requires the court to determine whether the workers at issue are, for purposes of setting a premium under Olivas' worker's compensation insurance policy, independent contractors or employees of Olivas. The test to determine whether the workers at issue are employees or independent contractors is found in Wis. Stat. § 102.07(8)(b), not in common-law criteria used to distinguish employees and independent contractors.

¶ 5. If the workers at issue are independent contractors under Wis. Stat. § 102.07(8)(b), they are not employees under the Act and they do not receive worker's compensation; Olivas would not owe any additional premiums to Acuity Insurance.

¶ 6. If the workers at issue are not independent contractors under Wis. Stat. § 102.07(8)(b), they are employees under the Act pursuant to Wis. Stat. § 102.07(8). The court must then address whether an employment relationship exists under the Act between these worker-employees and Olivas, the alleged employer. If such an employment relationship exists, the workers at issue are covered by Olivas' worker's compensation insurance policy and Acuity Insurance may recover additional premiums from Olivas.

¶ 7. For the reasons set forth, we affirm the decision of the court of appeals affirming the order of the circuit court. We agree with both parties and the nonparties who filed a brief that the Act, not the common law, governs whether the workers at issue are

independent contractors or Olivas' employees.[5] We further agree with Acuity Insurance that the workers at issue do not satisfy the nine-part test for independent contractors set forth in Wis. Stat. § 102.07(8)(b). Accordingly, the workers at issue are employees under Wis. Stat. § 102.07(8) of the Act.

¶ 8. We agree, however, with Olivas that the workers at issue are not employees in his service in the course of his trade, business, profession, or occupation. In other words, no employment relationship exists between the workers at issue and Olivas. Accordingly, Acuity Insurance could not take them into account in setting the premium for Olivas' worker's compensation insurance policy. We therefore affirm the decision of the court of appeals that the complaint must be dismissed.

¶ 9. First we set forth the facts (Part I), the standard of review (Part II), the allocation of the burden of proof (Part III), and the application of the policy, the Act and the common law (Part IV). There are two parts to resolving the merits of the issue presented: whether the workers at issue are independent contractors (Part V), and whether an employer-employee relationship exists between Olivas and the workers at issue (Part VI).

I

¶ 10. Both the relevant facts derived from the testimony and the circuit court's findings of fact are essentially undisputed.

---

[5] Both parties and the Wisconsin Insurance Alliance and the Wisconsin Compensation Rating Bureau, which filed a non-party brief, disagree with the court of appeals' decision that the case is governed by the common law. The court agrees with the parties and the nonparties that the case is governed by the Act.

649

¶ 11. Steve Tenpas, the owner of a drywall contracting and painting business named Tenpas Drywall, contracted with Olivas, a drywall installer, for Olivas to do drywalling. Desiring to minimize his own liability, Tenpas informed Olivas that before he would hire him as a subcontractor, Olivas would first have to secure his own worker's compensation and liability insurance.

¶ 12. To satisfy Tenpas, Olivas purchased a liability and worker's compensation insurance policy from Acuity Insurance in 2001. Olivas was a "named insured" in his capacity as a sole proprietor; no employees were named as additional insureds. Acuity Insurance initially calculated Olivas' annual premium payment to be $3,513, based on Olivas' estimated $25,000 annual earnings. Under the policy, Acuity Insurance reserved the right to conduct an audit and adjust the premium according to Olivas' actual remuneration.

¶ 13. When Acuity Insurance audited Olivas in April 2003, the auditor discovered that Olivas had received approximately $190,000 from Tenpas. Acuity Insurance substantially increased Olivas' premiums to reflect its exposure for worker's compensation for the workers at issue. Olivas did not pay the increased premium, the policy terminated, and Acuity Insurance brings this action for unpaid premiums in the amount of $32,192.30.

¶ 14. The case proceeded to trial on the single issue of whether the workers at issue were independent contractors or employees under the Act.

¶ 15. According to the record, Olivas is a drywall installer. Olivas obtained jobs from Tenpas, which he usually completed with five men. Olivas was the only worker who spoke some English, so he alone communicated with Tenpas.

¶ 16. Tenpas paid Olivas on a "per job" basis. Tenpas alone decided the payment for each job, based on the size and the difficulty of the project. Olivas had no say about the amount of the payment. Tenpas did not use a competitive bidding process to parcel out the jobs.

¶ 17. Olivas and the workers at issue divided the payments from Tenpas among themselves, as they decided, based on the work each did and each worker's experience. Olivas asserted that he made no profit from the work of the others.

¶ 18. Olivas received one Form 1099 from Tenpas (which is in the record), and each worker received a Form 1099 from Olivas. These latter forms are not in the record.

¶ 19. Olivas testified that he and Tenpas entered this arrangement because the other five workers did not have "papers." An inference can be made from the testimony that the five workers at issue are undocumented aliens. Tenpas testified that he required all subcontractors to get their own liability and worker's compensation policies because he wanted to avoid large premiums on his own worker's compensation policy.

¶ 20. Tenpas testified that he knew that Olivas had a "crew" assisting with the jobs and saw these workers at the job sites but otherwise had little interaction with them. Tenpas acknowledged that he did not check whether the workers had proper INS documentation. He stated that he investigates the backgrounds of the workers on his payroll but avoids investigating the backgrounds of others who work with the subcontractors.

¶ 21. Olivas testified further that he was not in control of the work group; that he did not control the hours that each person worked; and that he did not

have the power to hire or fire any worker. Each worker was responsible for his own tools.

¶ 22. One of the workers, Jose Mireles, testified at trial and corroborated Olivas' testimony.

¶ 23. The circuit court found that each of the workers owned his own equipment; that each received a Form 1099 for tax purposes; that the workers agreed among themselves how Tenpas' payments would be distributed; that the payments were distributed according to the agreement; that each worker was equally responsible to complete the job satisfactorily; that each ran the same risk of nonpayment by Tenpas; and that the risk was minimal because Tenpas provided the supplies. On the basis of these findings of fact, the circuit court reached the legal conclusion that the workers were independent contractors under Wis. Stat. § 102.07(8)(b) and dismissed Acuity Insurance's complaint with prejudice.

## II

¶ 24. The standard of review is not disputed. We review findings of fact made by the circuit court under Wis. Stat. § 805.17(2): "Findings of fact shall not be set aside unless clearly erroneous . . . ." The relevant historical facts set forth above essentially are not in dispute.

¶ 25. The parties disagree about the law and the application of the law to the facts. This case therefore requires us to interpret the insurance policy, the Act, and case law and apply them to the facts of the present case. Interpretation and application of an insurance policy, the Act, and case law are ordinarily questions of

law that this court decides independently of the circuit court and court of appeals, but benefiting from their analyses.

III

¶ 26. We begin by stating the parties' legal arguments (which we will later discuss in turn) in order to allocate the burden of proof, that is, to allocate both the burden of production of evidence and the burden of persuasion.

¶ 27. Acuity Insurance argues that whether it is entitled to additional premiums turns on whether the workers at issue are independent contractors under the nine-part test for independent contractors set forth in Wis. Stat. § 102.07(8)(b). If the workers are not independent contractors, then according to Acuity Insurance, the workers are automatically employees under § 102.07(8)(a) and Acuity Insurance is entitled to additional premiums. To Acuity Insurance, the determination of the status of the workers as independent contractors or employees under § 102.07(8) begins and ends the case.

¶ 28. In contrast, Olivas argues that whether Acuity Insurance is entitled to additional premiums turns on whether an employer-employee relationship exists between him and the workers under Wis. Stat. § 102.07(4). If the workers are not Olivas' employees, then according to Olivas, Acuity Insurance is not entitled to additional premiums. To Olivas, the determination of the employer-employee relationship under § 102.07(4) begins and ends the case.

¶ 29. As we shall explain further, both parties have valid arguments. We conclude that for Acuity Insurance to succeed in its claim for additional premi-

653

ums from Olivas, the workers at issue (1) cannot be independent contractors under Wis. Stat. § 102.07(8)(b), and (2) must have an employer-employee relationship with Olivas. This analysis is consistent with both *Jarrett v. LIRC,* 2000 WI App 46, 233 Wis. 2d 174, 607 N.W.2d 326, and *Labor Ready, Inc. v. LIRC,* 2005 WI App 153, 285 Wis. 2d 506, 702 N.W.2d 27.

¶ 30. *Jarrett* supports the proposition that whether a person is an employee or independent contractor must be determined under the statutory test for independent contractor status set forth in Wis. Stat. § 102.07(8). *Labor Ready* supports the proposition that a sufficient employment relationship between an employee and the alleged employer must exist before the Act will apply.[6]

¶ 31. The questions of who has the burden of proof of the status of the workers at issue as independent contractors and of their employment relationship to Olivas are questions of law.[7] This court ordinarily decides questions of law independently of the circuit court or court of appeals.

¶ 32. Acuity Insurance acknowledges that it has the burden to establish its prima facie contract case, namely its rights under the contract and the breach of the contract. It argues, however, that it has met that

---

[6] For a similar discussion of the relationship between these two propositions, see *St. John v. The Last Detail,* WC Claim No. 1995007051 (LIRC Feb. 28, 2000).

[7] *See, e.g., State v. Armstrong,* 223 Wis. 2d 331, 344, 588 N.W.2d 606 (1999); *State v. Big John,* 146 Wis. 2d 741, 755, 432 N.W.2d 576 (1988); *State v. McFarren,* 62 Wis. 2d 492, 499, 215 N.W.2d 459 (1974); *Long v. Ardestani,* 2001 WI App 46, ¶ 36, 241 Wis. 2d 498, 624 N.W.2d 405.

burden by establishing the terms of the policy governing the calculation of the premium and the increase in Olivas' revenues over the $25,000 he estimated.

¶ 33. Acuity Insurance further asserts that given the broad definition of "employee" in the Act, and the presumption that a worker is an employee, it satisfied its burden to establish that the workers at issue are employees for purpose of the Act. Acuity Insurance relies on *Scholz v. Industrial Commission,* 267 Wis. 31, 41c, 65 N.W.2d 1 (1954), that the presumption of employee status exists and that the presumption constitutes prima facie proof that the workers at issue are employees.

¶ 34. The *Scholz* case and its progeny do not support Acuity Insurance's reasoning. The presumption that a person is an employee and that a relationship of employer and employee exists arises only when the person "was rendering service for the alleged employer."[8] At issue in this case is whether the workers were rendering service for Olivas. Thus the presumption that the workers are employees plays no role in the present case.

¶ 35. Furthermore, the *Scholz* presumption is a rebuttable presumption that "ceases to have force and effect when evidence to the contrary is adduced."[9] Evidence to the contrary has been adduced in the present case, and Acuity Insurance does not have the benefit of the presumption.

---

[8] *Revels v. Indus. Comm'n,* 36 Wis. 2d 395, 400, 153 N.W.2d 637 (1967).

[9] *Revels,* 36 Wis. 2d at 402 (citing *Conrad v. Indus. Comm'n,* 254 Wis. 574, 578, 37 N.W.2d 60 (1949)). *See also Scholz v. Indus. Comm'n,* 267 Wis. 31, 41b, 65 N.W.2d 1 (1954).

¶ 36. Acuity Insurance further asserts (without citation) that if an employer is trying to deny worker's compensation by contending that a person is an independent contractor, the employer has the burden to establish the facts supporting its position. Acuity Insurance then argues that it therefore follows that Olivas has the burden to prove that the workers at issue are independent contractors.

¶ 37. Older worker's compensation cases declare that the party seeking to defeat worker's compensation bears the burden to prove facts supporting its position.[10] More recently the court has disavowed this declaration and has ruled that an applicant has the burden to prove that he or she is an employee[11] and that the issue whether the applicant might be an independent contractor does not present an affirmative defense.[12] There is no claimant for worker's compensation in the present case.

¶ 38. For the reasons set forth, we disagree with Acuity Insurance's analysis and are not persuaded by Acuity Insurance's view of who has the burden of proof.

---

[10] *See, e.g., Huebner v. Indus. Comm'n,* 234 Wis. 239, 243, 290 N.W. 145 (1940) ("[I]t will be presumed, for the purposes of the compensation act, that the person was an employee and therefore the burden to prove otherwise rests upon him who seeks to defeat compensation."); *Connor Lumber & Land Co. v. Indus. Comm'n,* 203 Wis. 85, 87, 233 N.W. 559 (1930); *Habrich v. Indus. Comm'n,* 200 Wis. 248, 254, 227 N.W. 877 (1929).

[11] *Beecher v. LIRC,* 2004 WI 88, ¶ 52, 273 Wis. 2d 136, 682 N.W.2d 29 ("As a general matter, the burden of proof in a worker's compensation case lies with the claimant."); *Leist v. LIRC,* 183 Wis. 2d 450, 457, 515 N.W.2d 268 (1994) ("[T]he claimant has the burden of proving beyond a legitimate doubt all the facts essential to the recovery of compensation.").

[12] *Scholz,* 267 Wis. at 41c.

¶ 39. Our case law sets forth criteria to be used in allocating the burden of proof.

■

¶ 40. The court has adopted, in *State v. McFarren,* 62 Wis. 2d 492, 499–502, 215 N.W.2d 459 (1974), a five-factor analysis to be applied in allocating the burden of proof.[13] The five *McFarren* factors are: (1) the natural tendency to place the burden on the party desiring change; (2) special policy considerations such as those disfavoring certain defenses; (3) convenience; (4) fairness; and (5) the judicial estimate of probabilities.

¶ 41. We begin by applying these factors to the first issue in the present case: whether the workers are employees because they are not independent contractors under Wis. Stat. § 102.07(8)(b). The first *McFarren* factor favors placing the burden on Acuity Insurance as the party interested in changing the state of affairs between the parties. Acuity Insurance is attempting to collect additional funds and obtain judicial recognition of its claim.

¶ 42. The second factor about disfavored defenses is inapplicable.

■

¶ 43. The third factor relates to the ease of and access to proof. When facts lie peculiarly in the knowledge of a party, that party should ordinarily bear the

---

[13] These five factors were adopted from Charles T. McCormick, *McCormick's Handbook of the Law of Evidence,* § 337, at 787–89 (2d ed. 1972). *See also* 2 Charles T. McCormick, *Handbook of the Law of Evidence,* § 337, at 411–15 (5th ed. 1999). The *McFarren* factors were used, for example, in *State v. Big John,* 146 Wis. 2d 741, 756, 432 N.W.2d 576 (1988).

burden of proof on that issue.[14] At first glance, this factor favors placing the burden of proof of the status of the workers at issue on Olivas. He may know more about the workers than Acuity Insurance. Yet, *McFarren* cautions us not to overemphasize this factor: "Very often one must plead and prove matters as to which his adversary has superior access to the proof."[15] For example, nearly all allegations required of a plaintiff in tort or breach of contract actions relating to the defendant's acts or omissions describe matters peculiarly within the defendant's knowledge.[16] Additionally, with liberal discovery, parties are placed on more equal footing with regard to evidence. Olivas, Steve Tenpas, and the workers can provide Acuity Insurance with information.

¶ 44. The fourth factor, "fairness," has two component parts: (a) proof of exceptions and (b) proof of negatives. Proof of exceptions has been "defined as providing that one who relies on an exception to a general rule or statute has the burden of proving that the case falls within the exception."[17] With regard to proof of negatives: "[T]he party asserting the negative has the burden to prove it unless the facts are peculiarly within the other party's knowledge or are much more difficult for the former to prove than the latter."[18]

¶ 45. No proof of exceptions is involved here. We go to proof of negatives.

---

[14] *McFarren,* 62 Wis. 2d at 500.

[15] *Id.* (quoting Charles T. McCormick, *McCormick's Handbook of the Law of Evidence,* § 337, at 787 (2d ed. 1972)).

[16] 2 Charles T. McCormick, *Handbook of the Law of Evidence,* § 337, at 413 (5th ed. 1999).

[17] *Big John,* 146 Wis. 2d at 756.

[18] *McFarren,* 62 Wis. 2d at 503.

¶ 46. For Acuity Insurance to prevail, it must affirmatively prove that the workers are employees under the Act. Proof that the workers at issue are employees is accomplished by proof that the workers at issue do not meet at least one part of the independent contractor test under Wis. Stat. § 102.07(8).

¶ 47. The argument that Acuity Insurance should not have to prove a negative is not persuasive. The commonly stated maxim that a party cannot be asked to prove a negative[19] is not an invariable test, nor even always a significant circumstance. Parties frequently have to prove a negative. Wigmore explains that "the burden is often on one who has a negative assertion to prove; a common instance is that of a promisee alleging nonperformance of a contract."[20] A party can be required to aver and prove negative allegations, especially when the allegation is an essential part of the party's claim.[21] For example, a party alleging nondelivery has the burden of proving that issue; a party alleging failure to perform has the burden of proof; a party alleging that a signature is a forgery has the burden of proving that the document was not signed by the purported signatory. Thus this fourth factor does not convince us that the burden of proof of independent contractor status should be on Olivas.

---

[19] "Statements are found primarily in older cases to the effect that even though a party is required to plead a fact, it is not required to prove that fact if its averment is negative rather than affirmative in form." 2 McCormick, *Handbook of the Law of Evidence,* § 337, at 412 (5th ed. 1999).

[20] IX *Wigmore on Evidence,* § 2486, at 288 (Chadbourn rev. 1981).

[21] *Id.*

¶ 48. The fifth factor examines the judicial esti-mate of the probabilities. "The risk of failure of proof may be placed upon the party who contends that the more unusual event has occurred."[22] It is not unusual for an insurance company to audit an insured under a worker's compensation policy and increase premiums. Similarly, it is not unusual for a dispute to arise about the status of persons as employees or independent contractors. This factor favors placing the burden on Acuity Insurance to show that Olivas failed to account for his employees.

¶ 49. Considering the relative weight of the *McFarren* factors, we conclude that the burden of proof on the issue of whether the workers at issue were independent contractors more appropriately lies with Acuity Insurance.

■

¶ 50. Similar considerations lead us to conclude that Acuity Insurance bears the burden of proof that an employment relationship exists between Olivas and the workers at issue. Again Acuity Insurance is the party attempting to obtain judicial recognition of its claim and should bear the burden of proving why it is entitled to additional premiums. The second factor is not appli-cable. As to the third factor, as we explained previously, Acuity Insurance can gain access to the information it needs. The fourth factor is not relevant here. There are no exceptions or negatives involved in demonstrating the employment relationship.

¶ 51. Finally, with regard to the fifth factor, dis-putes about employment relationships are common in worker's compensation cases; the burden of proof

[22] 2 McCormick, *Handbook of the Law of Evidence,* § 337, at 413 (5th ed. 1999).

should be on Acuity Insurance, which is attempting to obtain judicial recognition that the relationship exists.

¶ 52. For the reasons stated, we conclude that Acuity Insurance has the burden of proof on both issues that resolve the present case.

## IV

¶ 53. Because this dispute involves an insurance policy, we examine the text of the policy to decide whether the policy, the Act, or the common law resolves the dispute.

¶ 54. The parties do not explore in detail the text of the policy. On this review the parties (and the nonparties who filed a brief) agree that the policy should be understood by reference to the Act and that the Act governs the resolution of the dispute.

¶ 55. We have examined the policy, and we agree with the parties that the text of the insurance policy directs us to the Act to resolve the issues presented.

¶ 56. Olivas purchased what appears to be a standard liability and worker's compensation insurance policy from Acuity Insurance. The policy lists only Olivas as a named insured. The policy explains that "if you [Olivas] are designated in the Declarations as . . . [a]n individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner." The policy also provides coverage for any employees of Olivas.

¶ 57. The policy requires Olivas to pay insurance premiums for any persons who subject Acuity Insurance to exposure to liability for worker's compensation. Under the policy, Acuity Insurance pays all benefits or compensation required of Olivas under the Act.

¶ 58. According to the policy, the premium is calculated on the following basis:

[P]ayroll and all other remuneration paid or payable during the policy period for the services of:

1. All your officers and employees engaged in work covered by this policy; and

2. All other persons engaged in work that could make us liable under Part One - Workers' Compensation Insurance of this policy.

¶ 59. The policy does not define "employees" or "other persons engaged in work that could make [Acuity Insurance] liable under the Worker's Compensation Insurance of this policy."[23]

¶ 60. The policy provides that the "terms of this insurance that conflict with the workers' compensation law are changed by this statement to conform to that law." The Act (Wis. Stat. § 102.31) also specifically provides that "[e]very contract for the insurance of compensation provided under this chapter or against liability therefor is subject to this chapter and provisions inconsistent with this chapter are void."

¶ 61. The policy obviously directs the courts to the Act to determine Acuity Insurance's exposure to liability for worker's compensation for the workers at issue and thus the premiums it can charge. We therefore conclude that the Act, not the common law, governs whether the workers at issue are independent contractors and whether the workers are Olivas' employees.

---

[23] The policy states only that " 'Employee' includes a *leased worker. Employee* does not include a *temporary worker.*" "Leased worker" and "temporary worker" are defined by the policy, but these definitions are not relevant here.

¶ 62. The parties agree, and so do we, that if the workers at issue are independent contractors under Wis. Stat. § 102.07(8)(b), they are not employees, and Acuity Insurance is not liable for them under the Act and the policy. Acuity Insurance therefore would not be entitled to additional premiums from Olivas.

¶ 63. The Act (Wis. Stat. § 102.07(8)(b)) establishes a nine-part test to determine whether a person is an independent contractor and not an employee for purposes of worker's compensation. Unless all parts of the nine-part test are met, the person is not an independent contractor exempt from the Act. To be an independent contractor, a person must meet all of the following conditions:

1. Maintains a separate business with his or her own office, equipment, materials and other facilities.

2. Holds or has applied for a federal employer identification number with the federal internal revenue service or has filed business or self-employment income tax returns with the federal internal revenue service based on that work or service in the previous year.

3. Operates under contracts to perform specific services or work for specific amounts of money and under which the independent contractor controls the means of performing the services or work.

4. Incurs the main expenses related to the service or work that he or she performs under contract.

5. Is responsible for the satisfactory completion of work or services that he or she contracts to perform and is liable for a failure to complete the work or service.

6. Receives compensation for work or service performed under a contract on a commission or per job or competitive bid basis and not on any other basis.

7. May realize a profit or suffer a loss under contracts to perform work or service.

8. Has continuing or recurring business liabilities or obligations.

9. The success or failure of the independent contractor's business depends on the relationship of business receipts to expenditures.[24]

¶ 64. Only if all nine parts of this test for independent contractors are met will the workers at issue fall within the definition of "independent contractor" and fall outside the definition of "employees" in the Act and therefore outside the· policy. Acuity Insurance insists that the workers at issue fail to meet one or more of this nine-part test.

■

¶ 65. We agree with Acuity Insurance that Wis. Stat. § 102.07(8)(b) provides the sole test for determining whether a person is an independent contractor exempt from the Act's coverage. Indeed, § 102.07(8)(b) was amended in 1989 to replace the then-used test for distinguishing between employees and independent contractors, a test that was based on common-law criteria for distinguishing between employees and independent contractors.

¶ 66. The nine-part test in Wis. Stat. § 102.07(8)(b) was enacted to provide an easily understood and easily applied test to determine who is an exempt independent

---

[24] Wisconsin Stat. § 102.07(8)(b) provides: "(b) An independent contractor is not an employee of an employer for whom the independent contractor performs work or services if the independent contractor meets all of the following conditions:"

contractor under the Act.[25] The Worker's Compensation Advisory Council[26] stated that "[t]his redefinition is to eliminate the disputes involving cases where insurance companies have collected premiums for individuals where they may not have any liability and cases where they have not collected premiums from individuals for whom they are liable and employers who were or were not paying premiums under the mistaken notion that the individuals working for them were or were not employees."[27] The Advisory Council expected that "this proposed amendment would clarify and redefine the term independent contractor so that employers and their insurance companies will be able to identify which

---

[25] *Jarrett v. LIRC*, 2000 WI App 46, ¶ 17, 233 Wis. 2d 174, 607 N.W.2d 326.

[26] The Worker's Compensation Advisory Council is a council created by statute, Wis. Stat. § 15.227(4). It consists of the following persons appointed by the Secretary of Workforce Development: a designated employee of the Department of Workforce Development as chairperson, five representatives of employers, and five representatives of employees. The Secretary of Workforce Development also appoints three representatives of insurers authorized to do worker's compensation insurance business in this state as nonvoting members of the council. Wisconsin Stat. § 102.14(2) requires the Advisory Council to "advise the department in carrying out the purposes of this chapter. Such council shall submit its recommendations with respect to amendments to this chapter to each regular session of the legislature and shall report its views upon any pending bill relating to this chapter to the proper legislative committee."

[27] This explanatory language from the Worker's Compensation Advisory Council can be found in a document entitled "Plain Language Analysis of Independent Contractor Recommendation" contained in the legislative file for 1989 Wis. Act 64, on file with the Legislative Reference Bureau, Madison, WI. *See also Jarrett,* 233 Wis. 2d 174, ¶ 17.

employees are covered by the Worker's Compensation Act."[28]

¶ 67. As discussed earlier, Acuity Insurance has the burden to prove facts from which a court could reach the conclusion of law that the workers at issue fail to satisfy at least one part of the nine-part test and therefore are not independent contractors under Wis. Stat. § 102.07(8)(b). The determination of whether the facts fulfill a statutory standard is a question of law that this court determines independently of the circuit court and court of appeals.

¶ 68. In determining whether the workers at issue fail to meet at least one part of the nine-part test, we look to the record and to decisions of the Labor & Industry Review Commission (LIRC) for guidance on the interpretation and application of Wis. Stat. § 102.07(8)(b). LIRC is the administrative body that regularly reviews worker's compensation claims. Although we are not bound by LIRC's reasoning, conclusions, or interpretations of the law, LIRC's specialized knowledge and experience can help this court in applying the nine-part test in Wis. Stat. § 102.07(8)(b).[29]

¶ 69. In *James v. B&P Drywall,* WC Claim No. 1999–051348 (LIRC July 28, 2000), LIRC had to decide whether a subcontractor who installed drywall was an independent contractor or an employee covered under

---

[28] *Id.* This legislative history is set forth in greater detail in *Jarrett,* 233 Wis. 2d 174, ¶ 17, and in the nonparties' brief.

[29] For a discussion of the deference due to administrative decisions on questions of law, see *Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals,* 2006 WI 86, ¶¶ 8–20, 292 Wis. 2d 549, 717 N.W.2d 184.

the Act. The drywall installer was paid on a per-job basis for projects he accepted from other contractors. The drywall installer supplied his own tools, and the contractors provided the drywall sheets. Based on these facts, LIRC concluded that the drywall installer who applied for worker's compensation was not an independent contractor.[30]

¶ 70. LIRC concluded that the drywall installer in *James* failed the seventh, eighth, and ninth parts of the test and therefore was not an independent contractor. The drywall installer had no continuing or recurring business liabilities or obligations or overhead. He had only a few tools that did not require frequent maintenance or replacement. LIRC opined that minor or trivial expenses like these could not result in the

---

[30] LIRC determined that the first part of the nine-part test, that is, that the worker maintains a separate business with his or her own office, equipment, materials, and other facilities, was not met in *James*. According to the evidence presented, the drywall installer kept his supplies in a bucket in the basement, did not have an office or home office, did not have a business card, did not set aside any space for business purposes, did not have a business phone line or office equipment, and did not keep any records except those needed for income tax purposes.

In the present case, in contrast to *James*, no evidence was presented regarding whether the workers maintained a separate business, where they kept their tools, and what facilities they maintained. We cannot just assume, without any evidence, that, like in *James*, these workers kept their tools in a bucket at their homes and did not have any equipment associated with running one's own business.

In an unpublished decision, the court of appeals affirmed LIRC's decision that the drywall installer was not an independent contractor under Wis. Stat. § 102.07(8)(b). *B&P Drywall v. LIRC*, 2001AP1422, unpublished slip op. (Wis. Ct. App. May 7, 2002).

success or failure of the business, as envisioned by the ninth part of the test. Because the drywall installer's "business" consisted of providing services with no overhead, LIRC concluded that the drywall installer did not have recurring expenses that could cause him to take a loss on any individual project.

¶ 71. Applying the teachings of *James* and examining the record in the present case, we conclude that the workers in the present case failed the seventh and ninth parts of the test. Each worker in the present case supplied only labor and simple tools like hammers that do not require frequent repair or replacement. The workers at issue did not have to purchase their own drywall sheets. There was no risk that the workers would suffer a loss on any of the jobs. They were paid only for the labor they put in, and they did not control any of the other costs involved with the project. Their success was not related to the relationship of business receipts to expenditures, but rather to how much labor they were willing to provide.

¶ 72. In reaching this conclusion of law, we disagree with the conclusion of law the circuit court reached. The circuit court did not analyze the facts with respect to each part of the nine-part test in reaching its conclusion of law that the workers at issue are independent contractors. The circuit court supported its conclusion of law with the following facts: each of the workers at issue owned his own equipment; each received a Form 1099 for tax purposes; the workers at issue agreed on how compensation would be distributed; the compensation was distributed according to the agreement; each worker at issue was equally responsible to complete the job satisfactorily; each ran the

same risk of nonpayment (which is minimal) because Tenpas provided the supplies; the only risk was nonpayment by Tenpas.

¶ 73. Even drawing inferences from the record to support the circuit court's conclusion of law that the workers at issue were independent contractors, we conclude that the workers failed at least one of the nine parts of the test.

¶ 74. We therefore conclude that Acuity Insurance satisfied its burden to prove that the workers at issue failed to meet at least one part of the nine-part test and therefore do not qualify as independent contractors. The workers are employees under Wis. Stat. § 102.07(8)(a).[31]

¶ 75. Acuity Insurance argues, based on *Jarrett v. LIRC,* 2000 WI App 46, 233 Wis. 2d 174, 607 N.W.2d 326, that the conclusion that the workers at issue are not independent contractors ends the inquiry and Acuity Insurance wins the case.

¶ 76. In *Jarrett,* 233 Wis. 2d 174, ¶ 17, the court of appeals concluded that "Wis. Stat. § 102.07(8)(b) was intended to provide the sole test for determining whether a worker is an independent contractor under the Act. . . . [T]he legislature intended § 102.07 to create two classes of persons, employees and independent contractors, and to provide the method for determining whether a person is an independent contractor."

---

[31] Wisconsin Stat. § 102.07(8)(a) provides that "every independent contractor [who does not satisfy the nine-part test under § 102.07(8)(b)] is an employee of any employer under this chapter for whom he or she is performing service in the course of the trade, business, profession or occupation of such employer at the time of the injury."

669

¶ 77. *Jarrett,* however, cannot be interpreted, as Acuity Insurance urges, as ending the inquiry in the present case and completely resolving the dispute. *Jarrett* is inapposite.

¶ 78. In *Jarrett,* Jarrett was held to be an independent contractor, not an employee. Consequently, in *Jarrett* neither LIRC nor the court of appeals had to examine whether an employment relationship existed under the Act between Jarrett and his alleged employer, that is, whether Jarrett's injury was sustained while he was in the service of the alleged employer. In *Jarrett,* the inquiry under Wis. Stat. § 102.07(8)(b) was the end of the inquiry under the circumstances of that case.

¶ 79. In the present case, after determining that the workers are employees, not independent contractors, we must proceed to decide whether an employment relationship exists between the workers and the alleged employer, an issue that did not arise in *Jarrett.*[32]

¶ 80. Simply concluding that the workers at issue are employees and not exempt independent contractors within the Act does not mean that Acuity Insurance can collect additional insurance premiums from Olivas for the workers at issue. The next question we must address is whether these workers are employees of Olivas.

VI

¶ 81. Even if the workers at issue are employees (and not independent contractors under the Act),

---

[32] After examining *Jarrett,* LIRC has recently concluded that the approach we use is the correct one, namely, a decision is made under Wis. Stat. § 102.07(8)(b). Then, when the issue is posed, a decision is made under Wis. Stat. § 102.07(4) regarding the employer-employee relationship. *St. John v. The Last Detail,* WC Claim No. 1995007051 (LIRC Feb. 28, 2000).

Olivas argues that Acuity Insurance is not liable for these workers under Olivas' policy unless Acuity Insurance proves that the workers are Olivas' employees, that is, unless Acuity Insurance proves that an employer-employee relationship exists between the workers at issue and Olivas.

¶ 82. The Act defines an employee in Wis. Stat. § 102.07. Subsection (4)(a) defines an employee as a "person in the service of another under any contract of hire, express or implied . . . if employed with the knowledge, actual or constructive, of the employer . . . ." Subsection (4)(a)2. excludes as an employee "[a]ny person whose employment is not in the course of a trade, business, profession or occupation of the employer . . . ."

¶ 83. The concept that an employee is in the service of another in the course of a trade, business, profession, or occupation of an employer also appears in Wis. Stat. § 102.07(8)(a), which provides that a worker who does not satisfy any part of the nine-part test for independent contractors is an "employee of any employer under this chapter for whom he or she is performing service in the course of the trade, business, profession or occupation of such employer . . . ."

■

¶ 84. Key to defining an employee under the Act, then, is the concept that an employee is "in the service of another in the course of a trade, business, profession or occupation of an employer." Clearly the Act does not impose worker's compensation liability on an employer when the employer does not have an employer-employee relationship with an injured person. The Act governs employers and their employees. "The foundation of the Workmen's Compensation Act is the exist-

ence of an actual employer-employe [sic] relationship." *Wendlandt v. Indus. Comm'n,* 256 Wis. 62, 67, 39 N.W.2d 854 (1949).

¶ 85. A sufficient nexus must exist between Olivas and the workers at issue to enable this court to conclude that these workers are in the service of Olivas in the course of Olivas' trade, business, or occupation. Olivas' worker's insurance policy does not cover every person who is an employee of some employer; it covers only employees in the service of Olivas.

¶ 86. The most recent case interpreting Wis. Stat. § 102.07(4)(a) and its definition of "employee" is *Labor Ready, Inc. v. LIRC,* 2005 WI App 153, 285 Wis. 2d 506, 702 N.W.2d 27. Labor Ready was a temporary help agency that operated as a hiring hall. The applicant for worker's compensation was injured at Labor Ready's facilities, while the applicant was awaiting a possible job assignment. The court of appeals affirmed LIRC's decision that the applicant was an employee of Labor Ready under § 102.07(4)(a) when he was injured.

¶ 87. In determining the existence of an employer-employee relationship under the Act, the court of appeals applied the test established in *Kress Packing Co. v. Kottwitz,* 61 Wis. 2d 175, 182, 212 N.W.2d 97 (1973). Although the *Kress Packing* test has been supplanted by Wis. Stat. § 102.08(b) for deciding independent contractor status for purposes of the Act,[33] the *Labor Ready* case demonstrates that the *Kress Packing* test continues to have vitality in determining whether a person is an employee under Wis. Stat. § 102.07(4)(a).

---

[33] *See Jarrett,* 233 Wis. 2d 174, ¶ 17 ("Wisconsin Stat. § 102.07(8)(b) . . . replaced the previous criteria for determining independent contractor status under the Act.").

¶ 88. *Kress Packing* established the primary test for determining an employer-employee relationship: Does the alleged employer have a right to control the details of the work?[34] In assessing the right to control, four secondary factors are considered: (1) direct evidence of the exercise of the right of control, (2) method of payment of compensation, (3) furnishing of equipment or tools for the performance of the work, and (4) right to fire or terminate the employment relationship.[35]

¶ 89. The *Kress Packing* test is fact-specific. Carefully examining the record, the court of appeals concluded in *Labor Ready* that the applicant was an employee of Labor Ready because Labor Ready had exercised control of the applicant even before the applicant was assigned to a job. The court of appeals emphasized that Labor Ready provided the facility at which the applicant was required to appear and wait. Furthermore, Labor Ready documented the applicant's status as an employee. The forms prepared by Labor Ready and signed by the applicant referred to the applicant as an employee; the applicant completed an Employee Withholding Allowance Certificate (W-4) for income tax purposes; the applicant was paid by Labor Ready, not the customer to whom the applicant would be assigned. All these facts led the court of appeals to conclude that the "parties have sufficient relevant indicia of an employer-employee relationship . . . [and] for purposes of worker's compensation statutes, [the applicant] was Labor Ready's employee at the time he was injured. *See* Wis. Stat. § 102.07(4)(a)."[36]

---

[34] *Kress Packing Co. v. Kottwitz,* 61 Wis. 2d 175, 182, 212 N.W.2d 97 (1973).

[35] *Id.*

[36] *Labor Ready, Inc. v. LIRC,* 2005 WI App 153, ¶ 17, 285

¶ 90. LIRC cases also demonstrate that the *Kress Packing* test continues to have vitality in determining whether a sufficient employer-employee relationship exists under the Act between an applicant and an alleged employer.

¶ 91. For instance, in *Nickell v. County of Kewaunee*, WC Claim No. 94064155 (LIRC Sept. 24, 1996), LIRC addressed the worker's compensation claim of a caregiver who was indisputably an employee under the Act. The issue to be decided was in whose service the caregiver-employee was for purposes of worker's compensation. In answering this question, LIRC examined the *Kress Packing* secondary factors, focusing on who hired the caregiver, who had the ability to fire the caregiver, and who ultimately paid the caregiver's wages. Acknowledging that "this case is not so clear-cut," LIRC concluded that the factors weighed in favor of holding that an employee-employer relationship existed between the caregiver and the county, not between the caregiver and the person cared for. The county arranged the general terms of employment and ultimately paid for the caregiver's services, even though the caregiver's direct services were not rendered to the county.[37]

---

Wis. 2d 506, 702 N.W.2d 27. The court of appeals went on to conclude that the applicant-employee was performing service growing out of and incidental to his or her employment under Wis. Stat. § 102.03(1).

[37] In *Day v. Village of Greendale*, WC Claim No. 94005719 (LIRC May 18, 1995), an applicant for worker's compensation was injured during a physical agility test before being hired. In determining whether the person qualified for worker's compensation, LIRC relied on the *Kress Packing* factors in assessing the employment relationship between the parties. LIRC refused

¶ 92. With the *Kress Packing* test in mind and these examples of the application of the test, we review the facts of the present case to consider whether there are sufficient indicia of an employer-employment relationship under the Act between Olivas and the workers at issue.

¶ 93. Olivas argues that the record demonstrates he was a go-between, middleman, or broker and that the workers at issue were not in his service.

¶ 94. According to Acuity Insurance, Olivas occupied a significant leadership role among the workers at issue. Acuity Insurance points to the fact that Olivas communicated with contractors about work opportunities and about the details of each assignment—information which he then relayed to the workers at issue; Olivas also received payment on behalf of the workers at issue and received the 1099 tax form from Tenpas.

---

to adopt the applicant's argument that the potential employer "controlled" the performance of the test. LIRC concluded that the agility test was voluntary and that the *Kress Packing* test was not satisfied.

In *Ambrose v. Harley Vandeveer Trust,* WC Claim No. 86–39393 (Feb. 28, 1989), LIRC applied the *Kress Packing* test to determine whether an employee-employer relationship existed between a caregiver and a trust for the benefit of the person for whom care was provided. LIRC held that the person for whom care was provided administered her own affairs and reserved the right to control the details of the caregiver's employment and to terminate the caregiver's employment. The trust, according to LIRC, was a conduit for compensation. The caregiver was not an employee of the trust under Wis. Stat. § 102.07(4). This decision was affirmed by the court of appeals in an unpublished decision. *Ambrose v. LIRC,* 1990AP440, unpublished slip op. (Wis. Ct. App. Oct. 23, 1990).

¶ 95. The circuit court, the court of appeals, and this court do not agree with Acuity Insurance's characterization of the record. The courts accept Olivas' position that the facts prove he was just a go-between, middleman, or broker.[38]

¶ 96. According to Olivas' and a worker's testimony (which the circuit court apparently found credible), the workers at issue were drywall installers. Olivas got the jobs on behalf of the workers at issue because he was able to speak English. He did not control the details of the workers' work. He did not order the workers at issue to hang a certain number of drywall sheets. He did not set their working hours.[39] He did not set their compensation. He did not pay them an hourly wage. The group decided the distribution of the per-job payment.

¶ 97. Olivas did not exercise the level of control that one would ordinarily expect from an employer. Indeed, he apparently did not have a right to control the workers. Thus, Olivas does not satisfy the *Kress Packing* primary control test.

---

[38] For a LIRC case in which LIRC had to decide whose employee the applicant was after it determined the applicant was not an independent contractor under Wis. Stat. § 102.07(8)(b), see *St. John v. The Last Detail*, WC Claim No. 1995007051 (Feb. 28, 2000). In that case, Reed (who was in the construction business) arranged a garage remodeling project as a favor to his in-laws. The roofer working on the garage was injured. Reed argued that he did not have an employer-employee relationship with the roofer. LIRC concluded that Reed was not a middleman and that when he was injured, the roofer was performing services for Reed.

[39] At trial, Olivas testified to the following: "Q. Did you tell the other workers what hours they had to work? A. No, I never said anything to them."

¶ 98. Nor does Olivas satisfy the *Kress Packing* secondary factors. As to the first factor, Olivas did not exercise control over the details of the workers' work. Admittedly, Olivas did help train two of his colleagues who lacked prior experience in drywall hanging. This factor alone, however, will not create an employer-employee relationship between the parties without other evidence of "control."

¶ 99. Second, Tenpas, not Olivas, determined how much would be paid for each job, based on the size and complexity of the job. Then the workers at issue and Olivas, not Olivas alone, determined how the proceeds from the job would be distributed. According to the record, the workers and Olivas agreed that those with the most experience, who could hang more drywall sheets, would receive greater compensation. Olivas did not pay the workers until Tenpas paid Olivas.[40]

¶ 100. Third, each worker supplied his own equipment, like hammers and other tools, as necessary. Olivas, like the other workers, brought equipment only for himself. Tenpas—not Olivas—supplied the drywall sheets for each project.

¶ 101. Fourth, Olivas had no individual right to hire or fire any of the workers at issue. Just as the workers at issue and Olivas collectively decided their compensation arrangement, so, too, they decided whether they would permit others to work with them. Sometimes they allowed others to assist them on larger projects; Olivas did not control that decision.[41] The

---

[40] When asked at trial "Does Miguel [Olivas] ever pay you when Steve [Tenpas] doesn't pay him?," one of the coworkers answered "No."

[41] At trial, Olivas testified to the following: "Q. Did you ever add people to the group? A. When it was a bigger job, we would

workers at issue had not fired anyone, and instead, each worker could decide for himself whether he wished to work on a project. Workers had quit jobs, on their own terms and without need of Olivas' permission. There was no contract, express or implied, binding these workers to Olivas or Olivas to these workers.

¶ 102. Although under *Kress Packing* "a benefit conferred does not necessarily point to an employee-employer relationship,"[42] we may consider in determining whether the workers at issue were in the service of Olivas whether they conferred a benefit upon Olivas. Olivas received no pecuniary gain from his relationship to the workers. Each worker at issue, and Olivas, received remuneration according to a decision of the group. Olivas distributed Tenpas' payment without taking an extra share. At trial, Olivas explained he "did not have any gains" or profit from his role.

¶ 103. Olivas' prominent position emerges from the stark scenario that he is the only one with sufficient English skills to handle these matters and perhaps the only person legally entitled to work.[43] Olivas, it appears, was the translator, not the employer, and his role

all agree to bring one other person. It would depend on the job that we were doing. Q. And the decision was made by the group? A. Yes. Q. It wasn't made by you? A. No."

[42] *Kress Packing,* 61 Wis. 2d at 181. Whether the worker provides a "benefit" to the alleged employer is not the dispositive factor in establishing an employer-employee relationship between the parties. *Lange v. DILHR,* 40 Wis. 2d 618, 162 N.W.2d 645 (1968) ("something more than an incidental benefit to the claimed employer must be found to link the asserted employer and asserted employe [sic]").

[43] At trial, Olivas testified that Tenpas would relate to him the details of each assignment "because the other ones didn't speak English."

678

as translator should not saddle him with obligations under worker's compensation.

¶ 104. The factors relied on by Acuity Insurance's auditor to conclude there was an employer-employee relationship between Olivas and the workers at issue are legally insufficient. The auditor testified at trial that she believed that Olivas oversaw the work of the group solely because the group was working together. The auditor also testified that she believed Olivas was the employer because he was the only one that actually got paid and he was getting the jobs. Under the totality of the circumstances of the present case, these facts upon which the auditor relied are consistent with the conclusion that Olivas occupied a leadership role with the workers at issue, not that the workers at issue were his employees.

¶ 105. Examining the record as a whole, we conclude that there were not sufficient indicia of an employer-employee relationship between Olivas and the workers. We conclude that the facts and the reasonable inferences therefrom lead to the conclusion of law that the workers were not performing work in Olivas' service. We thus hold that Acuity Insurance cannot require Olivas to pay additional insurance premiums for these workers.[44]

* * * *

¶ 106. For the reasons set forth, we affirm the decision of the court of appeals affirming the order of the circuit court. We agree with both parties and the non-parties that the Act, not the common law, governs

---

[44] This case does not require us to determine who had an employer-employee relationship with the workers at issue. We do not address this question.

whether the workers at issue are independent contractors and Olivas' employees. We further agree with Acuity Insurance that the workers at issue do not satisfy the nine-part test for independent contractors set forth in Wis. Stat. § 102.07(8)(b). Accordingly, the workers at issue are employees under Wis. Stat. § 102.07(8) of the Act.

¶ 107. We agree, however, with Olivas that the workers at issue are not employees in his service in the course of his trade, business, profession, or occupation. In other words, no employment relationship existed between the workers at issue and Olivas. Accordingly, Acuity Insurance could not take these workers into account in setting the premium under Olivas' worker's compensation insurance policy. We therefore affirm the decision of the court of appeals affirming the order of the circuit court that the complaint must be dismissed.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 108. LOUIS B. BUTLER, JR., J. (*concurring*). I concur. The dissent in this case makes for good reading, but it is light on substance. It suggests that Miguel Olivas is an "employer" under Wis. Stat. § 102.04(1)(b)1. and (1)(e)(2003–04).[1] No evidence exists in this record that Olivas entered into a written or oral contract to employ anyone.

¶ 109. In order to be an "employer," Olivas would have to employ three or more employees,[2] or he would have to have a person in service "*under any contract of*

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version of the statutes unless otherwise noted.

[2] Wis. Stat. § 102.04(1)(b)1.

*hire, express or implied, oral or written."*[3] Assuming that Olivas qualifies as an employer under either Wis. Stat. § 102.04(1)(b)1. or (1)(e), he then is deemed thereby to have elected, as an employer who has entered into a contract for the insurance of compensation, or against the liability therefore, as provided in Wis. Stat. § 102.05, to become subject to the provisions of Chapter 102.[4] The applicable provision of § 102.05 provides that "[a]ny employer who shall enter into a contract for the insurance . . . shall be deemed thereby to have elected to accept the provisions of this chapter, and such election shall include . . . employees . . . if such intent is shown by the terms of the policy." Wis. Stat. § 102.05(2).

¶ 110. Under Wis. Stat. § 102.04(1)(e), the creation of an employment contract is a necessary requirement before one can be deemed to have elected to become an employer pursuant to Wis. Stat. § 102.05. Acuity bears the burden of proving the existence of an employer-employee relationship between Olivas and the workers at issue,[5] and Acuity has failed to meet its burden. I agree with the majority's holding that "the *Kress Packing* test continues to have vitality in determining whether a sufficient employer-employee relationship exists under the Act between an applicant and an alleged employer,"[6] and its conclusion that the workers at issue were not employees of Olivas under this test.[7] I would add only that these workers were not

---

[3] Wis. Stat. § 102.04(1)(e) (emphasis added).

[4] Wis. Stat. §§ 102.04(1)(e) and 102.05(2).

[5] Majority op., ¶¶ 31–52.

[6] Majority op., ¶ 90 (referring to *Kress Packing Co. v. Kottwitz,* 61 Wis. 2d 175, 182, 212 N.W.2d 97 (1973)).

[7] Majority op., ¶¶ 92–105.

Olivas' employees under the plain language of § 102.04(1)(e).[8] No contract of hire, express or implied, oral or written, has been offered into evidence. Indeed, the evidence is to the contrary. Majority op., ¶¶ 21–22, 81–105. *See also* dissent, ¶¶ 125, 130–131.

¶ 111. The dissent simply assumes that an employment relationship exists in the absence of any evidence to support that assumption, because, after all, there were six workers, but only one insurance policy. Yet, no written contract of employment between Olivas and the other workers was offered into evidence. No testimony was introduced establishing an oral contract of employment between Olivas and the other workers. In the absence of any evidence of any written or oral employment contract between Olivas and the other workers, or that an employment relationship between Olivas and the other workers otherwise existed under the statutes or common law, Acuity has simply failed to establish how the remainder of Chapter 102 is at all applicable. The evidence is just not there.

¶ 112. One need only look at the terms of the insurance policy to see who was covered under the policy. Acuity's policy lists Miguel A. Olivas as the first named insured. In that part of the policy that lists additional named insureds, the policy itself provides the answer: "NONE." The policy lists as "FIRST NAMED INSURED," "INDIVIDUAL." While the policy does cover "[y]our employees . . . for acts within the scope of their employment[,]" evidence must exist that any covered individual is "your" employee.

¶ 113. Olivas testified that he was not an employer and did not have any workers, but was one of a group of six people who hung drywall for Steve Tenpas.

---

[8] *See also* Wis. Stat. § 102.07(4)(a).

Jose Mireles, one of the six workers in question, testified that he worked for Steve Tenpas. None of the remaining workers were called to testify by Acuity. As Acuity has the burden of proof as to the status of the workers to establish its prima facie contract case, it has simply failed to carry its burden. Any "election" to become an "employer" referred to by the dissent is simply irrelevant in the absence of proof of an employment contract.

¶ 114. Accordingly, I join the majority opinion in this matter.

¶ 115. DAVID T. PROSSER, J. (*dissenting*). In this case, the court decides much more than whether Miguel Olivas owes additional premiums on worker's compensation and business liability policies issued to him by Acuity. The majority makes law by opining about who qualifies as an employer and who qualifies as an employee under the Wisconsin Worker's Compensation Act in circumstances where the purported employees are undocumented workers. Because the precedent established by this decision creates uncertainty for employers, insurers, and workers, I respectfully dissent.

## FACTUAL BACKGROUND
## AND PROCEDURAL HISTORY

¶ 116. Unless noted otherwise, the following facts are based on the record made at a September 27, 2004, trial to the Sheboygan County Circuit Court, James J. Bolgert, Judge.

¶ 117. In making its case for additional premiums, Acuity presented two witnesses: Deb Seidel, a premium auditor who had worked for Acuity for 16 years, and Steven Tenpas, a Sheboygan County drywall contractor.

683

¶ 118. Tenpas owns Steve Tenpas Drywall, Inc. At the time of trial, he had operated his business for 23 years, and his son had become part of the business. The record does not indicate the number of payroll employees in the business, but Tenpas stated that when his company hires an employee for the payroll, the employee's history is investigated.

¶ 119. Tenpas testified he had known Miguel Olivas for about five years. "He came to me looking for work as a subcontractor." For many years Tenpas had asked all his subcontractors to obtain and show proof of "workmen's comp and liability" policies, and he asked Olivas to comply with this requirement. The requirement resulted from an early experience Tenpas had with his business. The business grew rapidly, hired outside subcontractors, and then was audited by its worker's compensation carrier. The implication of the testimony is that Tenpas was required to pay additional worker's compensation premiums for non-payroll "employees."

¶ 120. Against this background, Tenpas bluntly explained his motivation. He said he required his subcontractors to obtain worker's compensation coverage for their employees "so that I don't have to pay [for worker's compensation]." "[H]e [Olivas] is in charge of whoever he hires, and they are covered." He added:

I don't know the people personally who he hires, so I don't have to be responsible for his men. If I hire somebody in a payroll, we kind of—we investigate their history and stuff like that. And if you hire a sub, you don't know exactly the history of all of his employees, so I require workmen's comp and liability from them so they are responsible for their workers.

¶ 121. Tenpas testified that he paid Olivas each week by check, whereas he paid his own employees every two weeks. Tenpas gave Olivas a Form 1099 at the

684

end of each year. The Form 1099 for 2002 showed payments to Olivas of $193,644.17. The Form 1099 for 2003 showed payments of $191,370.27.

¶ 122. Tenpas testified that Olivas was never on his payroll as an employee and that Olivas's workers were never on his payroll as employees. He said he gave jobs to Olivas and that he and Olivas determined the price to be paid for the jobs based on the number of sheets of drywall to be installed, which reflected the number of square feet of wall space to be covered. The price could go up based on the difficulty of a job.

¶ 123. Tenpas stated that he did not determine the number of people who worked on a subcontracted job, or the identity of the people working, or how long they worked, or how much money they were paid. He did not hire or fire any of the subject workers. He did not know whether Olivas or his workers worked exclusively on Tenpas projects because that was up to Olivas. He said he knew Olivas had "done a few small jobs" for others; that "he did work for another drywall company the beginning of last year [2003] . . . I believe for a while." The implication of the testimony is that Olivas was not required to work exclusively for Tenpas.

¶ 124. Tenpas acknowledged that he knew Olivas did not work alone, that he had a crew of workers. He had seen these workers at work sites, had said hello to them, and knew some of their first names. However, there was a language barrier between him and these workers, he said, so that virtually all substantive communication was with Olivas.

¶ 125. In his defense, Miguel Olivas testified that he was not an employer. He said he was simply one of a group of six people who did drywall work for Steve Tenpas. Of this group, Olivas was the only one who spoke English and the only one with "papers." That is

why Olivas was the one who approached Tenpas for work and the only one who spoke to Tenpas about job assignments and compensation. Olivas said that Tenpas supplied the drywall and other materials for jobs but not the tools used by the workers.

¶ 126. When Olivas first came to Tenpas, Tenpas told Olivas that he required proof of a worker's compensation policy before permitting Olivas and his crew to work. Olivas secured a policy and showed Tenpas the required proof. He said Tenpas did not require the other workers to "provide proof of work comp insurance."

¶ 127. Tenpas paid Olivas weekly by a check made out to Olivas. Olivas, in turn, gave money to the other workers. He testified that he "did not have any gains" (e.g., profits) and that the group collectively made the decision how to divide up the money. "I did not make that decision," he said. The six "would come to an agreement on who was going to get what, because we had different skill levels." In making payments to others, Olivas did not withhold any money for social security or income taxes. At the end of the year, Olivas received a single Form 1099 from Tenpas, and he then gave a Form 1099 to each of the other workers.

¶ 128. Olivas acknowledged that he taught some of the other workers about drywalling and participated in group decisions to replace workers who left the group or add a new worker for a particular job. He said, however, that he had no power to fire anybody.

¶ 129. Olivas was asked whom he worked for "from December 7th of 2001 to December 7th of 2002." He replied: "For Steve only. Only Steve." He was then asked, "[D]id you do any work for anybody else?" He replied, "No, only him."[1]

---

[1] Olivas's testimony appears to conflict with Tenpas's testimony. It should be noted, however, that Tenpas testified to what

¶ 130. Olivas said:

I don't have any workers. We are just a group of workers.

. . . [T]hey are not my employees, because we are just a group of workers.

. . . .

I was never a supervisor, because we were all—the group of us, we were just independent workers.

. . . .

No one explained anything to me.

. . . .

None of us were responsible. It was just an innocent group that we didn't know any of the laws from here.

¶ 131. As part of his defense, Olivas called Jose Mireles, one of the workers. Mireles testified that he worked for Steve Tenpas. "Miguel pays me, but Steve pays him." He testified that Olivas did not make a profit from the work Mireles did, but he also stated that some members of the group were paid more than others "because some of us have more experience than others." He stated that Olivas gave him a Form 1099 at the end of the year. He testified that he never dealt directly with Steve Tenpas.

## DISCUSSION

¶ 132. On the surface, this case involves nothing more than an insurance company's demand for addi-

he thought occurred in 2003; Olivas *may* have testified only to what occurred in 2001 and 2002.

687

tional premiums from an insured who purchased worker's compensation and business liability insurance policies. To resolve this dispute, however, the court addresses relationships and responsibilities in the workplace as they are affected by the terms of insurance policies and the Wisconsin worker's compensation law.

¶ 133. Miguel Olivas wanted to obtain work for himself and his friends from Steve Tenpas. Tenpas was willing to provide work to Olivas and his friends but not as payroll employees. Payroll employees necessitate regular compensation, fringe benefits, withholding for social security and income taxes, worker's compensation coverage, unemployment compensation coverage, and liability coverage. Payroll employees are the people an employer normally wants to keep working if and when the economy slows down.

¶ 134. Tenpas is an "employer" with "payroll" employees. However, under the law, people who do any substantial amount of work for an "employer" also become "employees" *for worker's compensation purposes,* irrespective of whether they are formally on the employer's payroll, *unless* they fit into some other statutory category. *See* Wis. Stat. §§ 102.04(1)(b)1., 102.07(4).

¶ 135. Building contractors like Tenpas often engage subcontractors. These subcontractors may be "employers" and/or independent contractors—not "employees"—if certain criteria are met.

¶ 136. A contractor may become responsible for work-related injury to a subcontractor and his employees if the subcontractor fails to provide for his own worker's compensation coverage. *See* Wis. Stat. § 102.06. But contractors are not liable for injuries to a subcontractor and his employees when the subcontrac-

tor has elected to become an employer by purchasing an employer's worker's compensation policy. Wis. Stat. §§ 102.04(1)(e), 102.05(2).

¶ 137. The circuit court ruled that Olivas's workers were independent contractors under Wis. Stat. § 102.07(8)(b). This ruling excused Olivas from liability for additional premiums under his worker's compensation policy—at least in the absence of worker's compensation claims. But this court rejects the circuit court's ruling. It concludes that the workers were "employees." This conclusion makes Olivas responsible for additional premiums under his worker's compensation policy except for the court's additional determination that the workers were *not* employees of Olivas.

¶ 138. Although the court does not say so explicitly, the court implies that the Olivas workers were "employees," for worker's compensation purposes, of the only other suspect in this tale, Steve Tenpas. Without saying so, the court assigns legal responsibility for any worker's compensation claims from the five undocumented workers to Tenpas Drywall. This approach may or may not constitute good immigration policy, but it is bad worker's compensation law. It is bad worker's compensation law because it impairs a contractor's statutory defense to imputed liability, and it encourages subcontractor irresponsibility and fraud.

¶ 139. The term "employer" is defined in Wis. Stat. § 102.04. Tenpas Drywall is an "employer" under § 102.04(1)(b)1.: "Every person who usually employs 3 or more employees, whether in one or more trades, businesses, professions or occupations, and whether in one or more locations."

¶ 140. Miguel Olivas may be an "employer" under this same paragraph, but if he is not, then he is an

689

"employer" under Wis. Stat. § 102.04(1)(e). This paragraph provides that an employer includes:

> (e) *Every person* to whom pars. (a) to (d) are not applicable, *who has any person in service under any contract of hire, express or implied, oral or written, and who,* at or prior to the time of the injury to the employee for which compensation may be claimed, *shall, as provided in s. 102.05, have elected to become subject to the provisions of this chapter,* and who shall not, prior to such accident, have effected a withdrawal of such election.

Wis. Stat. § 102.04(1)(e) (emphasis added).

¶ 141. The above quoted paragraph references Wis. Stat. § 102.05. Section 102.05(2) provides:

> (2) Any employer who shall enter into a contract for the insurance of compensation, or against liability therefor, shall be deemed thereby to have elected to accept the provisions of this chapter, and such election shall include . . . employees not in the course of a trade, business, profession or occupation of the employer if such intent is shown by the terms of the policy. Such election shall remain in force until withdrawn in the manner provided in sub. (1).

¶ 142. Subsection (1) of § 102.05 provides in part:

> If an employer who is subject to this chapter only because the employer elected to become subject to this chapter under sub. (2) cancels or terminates his or her contract for the insurance of compensation under this chapter, that employer is deemed to have effected withdrawal, which shall be effective on the day after the contract is canceled or terminated.

Wis. Stat. § 102.05(1).

¶ 143. These provisions must be read in context with two other statutes: Wis. Stat. §§ 102.06 and 102.07(8m). The first statute, § 102.06, reads as follows:

102.06 Joint liability of employer and contractor. An employer shall be liable for compensation to an employee of a contractor or subcontractor under the employer who is not subject to this chapter, or who has not complied with the conditions of s. 102.28 (2) in any case where such employer would have been liable for compensation if such employee had been working directly for the employer, including also work in the erection, alteration, repair or demolition of improvements or of fixtures upon premises of such employer which are used or to be used in the operations of such employer. The contractor or subcontractor, if subject to this chapter, shall also be liable for such compensation, but the employee shall not recover compensation for the same injury from more than one party. The employer who becomes liable for and pays such compensation may recover the same from such contractor, subcontractor or other employer for whom the employee was working at the time of the injury if such contractor, subcontractor or other employer was an employer as defined in s. 102.04. This section does not apply to injuries occurring on or after the first day of the first July beginning after the day that the secretary files the certificate under s. 102.80(3)(a), except that if the secretary files the certificate under s. 102.80(3)(ag) this section does apply to claims for compensation filed on or after the date specified in that certificate.

¶ 144. Section 102.06 has its origin in the original worker's compensation law. Chapter 599, Laws of 1913; Wis. Stat. § 2394-6 (1913). The purpose of this section was explained in *Marinette County Fair Ass'n v. Industrial Commission*, 242 Wis. 552, 8 N.W.2d 268 (1943). It is "to prevent employers from relieving themselves of liability by doing through independent contractors

691

what they would otherwise do through direct employ-ees." *Id.* at 554 (quoting *Madison Entm't Corp. v. Indus. Comm'n,* 211 Wis. 459, 463, 248 N.W. 415 (1933)).

¶ 145. Section 102.06 was applied somewhat in-consistently[2] until this court decided *Green Bay Pack-aging, Inc. v. Department of Industry, Labor & Human Relations,* 72 Wis. 2d 26, 240 N.W.2d 422 (1976). In *Green Bay Packaging,* the injured "employee," Siem-zuch, was employed by Majeske to cut hardwood on land for which Majeske owned the "stumpage" rights. The wood was to be delivered to Green Bay Packaging for use in the manufacture of paper. Siemzuch was killed by a falling tree. Majeske had entered into a contract with Green Bay Packaging for the year in which Siemzuch was killed. *Id.* at 27. But he had failed to carry worker's compensation coverage. *Id.* at 31. Thus, the issue was whether Majeske, the immediate employer of Siemzuch, was a "contractor under" Green Bay Packaging, pursuant to Wis. Stat. § 102.06, even though Green Bay Packaging had virtually no control over Siemzuch. The court said:

> It is clear from the statute that an employer such as GBP shall be liable for compensation to an employee of a contractor or subcontractor under him, such as . . . Majeske . . . "who has not complied with the conditions of sec. 102.28(2), Stats., in any case where such em-ployer [GBP] would have been liable for compensation if such employe [Marcin Siemzuch] had been working directly for him." Here . . . Majeske did not carry the required workmen's compensation insurance. The lan-guage is crystal clear and does not permit of the

[2] *Compare Great Atl. & Pac. Tea Co. v. Indus. Comm'n of Wis.,* 205 Wis. 7, 236 N.W. 575 (1931), *with Marinette County Fair Ass'n v. Indus. Comm'n,* 242 Wis. 552, 8 N.W.2d 268 (1943).

qualifying restriction ... that a contractor under be performing part of the "ordinary and usual" business of the principal employer.

*Green Bay Packaging,* 72 Wis. 2d at 31–32.

¶ 146. To understand the relevance of *Green Bay Packaging* to the present case, it must be recognized that the court's opinion emphasizes that an employer can take steps to protect against unexpected, imputed worker's compensation liability. The opinion quotes from *Great Atlantic & Pacific Tea Company v. Industrial Commission of Wisconsin,* 205 Wis. 7, 236 N.W. 575 (1931), as follows:

> Thus construed, sec. 102.06 "conserves to the employee the indemnity intended to be given him by the legislature by making contractors liable for injuries received by employees of a subcontractor who is not under the act. *They [contractors] will be careful to protect themselves and will also see to it that their subcontractors are protected against such losses.*"

*Green Bay Packaging,* 72 Wis. 2d at 29–30 (quoting *Great Atl. & Pac. Tea,* 205 Wis. at 15) (emphasis added).

¶ 147. The *Green Bay Packaging* court stated that it was "returning to the A. & P. standard" and quoted that case to the effect that "sec. 102.06 was not intended to make an employer liable to the injured employees of every one with whom the employer had some sort of contractual relations." *Green Bay Packaging,* 72 Wis. 2d at 36 (quoting *Great Atl. & Pac. Tea,* 205 Wis. at 11).

¶ 148. The authority of an employer to protect himself from liability was reiterated in a Wisconsin Law Review article analyzing the *Green Bay Packaging* case. *See* Stuart B. Eiche, Note, *Worker's Compensation—*

693

*Liability Of Principal Employer For Injuries To Employees Of His Contractors Or Subcontractors,* 1977 Wis. L. Rev. 185:

> The court stated that the purpose of the statute is to protect employees of irresponsible and uninsured contractors to the same extent that direct employees of the principal employer are protected. Thus, liability is imposed on the principal employer under section 102.06 only when the contractor is not subject to the Worker's Compensation Act or does not carry compensation insurance. *To avoid liability, a principal employer need only require his contractors to protect themselves against such losses.*
>
> . . . .
>
> . . . *[S]ection 102.06 imposes liability on the principal only if his contractor or subcontractor is not subject to the Worker's Compensation Act or is uninsured.*

Eiche, *supra,* at 186, 192 (emphasis added).[3]

¶ 149. The second statute that must be considered in relation to Wis. Stat. §§ 102.04(1)(e) and 102.05(2) is Wis. Stat. § 102.07(8m). Subsection (8m) is

---

[3] Wisconsin Stat. § 102.06 is presently suspended because the legislature created an uninsured employers fund, 1989 Wis. Act 64, and the fund has a cash balance that equals or exceeds $4,000,000. *See* Wis. Stat. § 102.80(3). This means that an employee of an uninsured subcontractor will turn to the fund, rather than the remote "contractor," for worker's compensation benefits. Wis. Stat. § 102.81(1). The fund will then seek reimbursement for payments made. The law provides that an uninsured employer shall reimburse the fund for any payments made under § 102.81(1). *See* Wis. Stat. § 102.82(1). The suspension of § 102.06 does not vitiate the analysis because the principle that a contractor may seek to prevent liability by requiring a subcontractor to provide insurance coverage for the subcontractor's employees remains intact.

part of the section that defines "employee." It reads: "An employer who is subject to this chapter *is not an employee of another employer* for whom the first employer performs work or service in the course of the other employer's trade, business, profession or occupation." (Emphasis added.) This subsection makes the obvious point that a person is not simultaneously an employer and an employee on the same work project.

¶ 150. Applying the law to this case, Olivas *elected* to become an employer pursuant to Wis. Stat. §§ 102.04(1)(e) and 102.05(2) by entering into contracts with Acuity for the insurance of compensation and liability. He *elected* to become an employer (and to give up his potential status as a statutory employee) because Tenpas insisted that he purchase worker's compensation and liability insurance as a condition precedent to any contractual and employment relationship that Olivas and his friends could have with Tenpas Drywall. It is impossible to imagine that Steve Tenpas insisted that Miguel Olivas be covered personally by worker's compensation insurance but not Olivas's other workers. The fact is, the Acuity policies issued to Olivas covered any workers for whom Olivas could be liable. Those policies were in effect until they were canceled or terminated. Wis. Stat. § 102.05(1).

¶ 151. Acuity is upset not only because it believes Olivas owes the company additional premiums but also because it believes that it would have been liable under Olivas's insurance policies if one of Olivas's workers had been injured on the job. Acuity invokes the familiar principle that an insurer should not be expected to assume risks for which it has not been paid.

¶ 152. The dilemma in this case must be confronted head-on. If one of Olivas's workers—such as Jose Mireles—had been injured, the worker would

695

likely have sought worker's compensation benefits from (1) Olivas; (2) Tenpas; or (3) the uninsured employers fund. The most logical candidate is Olivas.

¶ 153. Olivas testified that he was not the employer of these workers. But the question is not whether Olivas *believed* the workers were his employees; the question is whether they were his employees, for worker's compensation purposes, as a matter of law.

¶ 154. The law often depends upon the facts. If this case were being remanded to the circuit court for additional fact finding, the better course would be to avoid comment on the evidence. But the case is not going back. It is over. This makes comment necessary.

¶ 155. Miguel Olivas elected to become an employer under Wis. Stat. §§ 102.04(1)(e) and 102.05(2). He purchased the requisite insurance. The insurance provided coverage for any employees he might have. Miguel Olivas also was an employer by the nature of his relationship with the workers. The workers were in Olivas's service under an implied contract of hire. Olivas played the critical role in securing jobs for his friends. He made the contacts with Tenpas Drywall. He discussed all the details of jobs, including time considerations and compensation. He told the workers where to go on jobs. He worked with them. He received all payments from Tenpas Drywall for jobs, and he disbursed all payments to others for their work.

¶ 156. Olivas and the five other workers were not equals. Because Olivas negotiated all Tenpas job assignments, he probably made sure that he participated in most, if not all, of those assignments. Why? Not every Tenpas job required a full crew of six workers. Because Olivas was the only worker who was certain to be burdened with social security and federal and state income taxes, he was entitled to take any job he wanted.

One doubts that the relationship among the workers was such that a majority of the workers could exclude Olivas from a job that he had obtained for them. Olivas was their meal ticket. He also participated in deciding on replacements and on any person brought in as an extra. He was not without power. He participated in "hiring."

¶ 157. In 2002 Olivas received payments totaling $193,644.17. In that year, he paid about $3500 in insurance premiums on *estimated* income of $25,000. If Olivas took money for the insurance premiums off the top, he still had about $190,000 to divide among himself and the five workers. The sum of $190,000 divided by 6 equals $31,666. This amount is obviously more than $25,000 and would trigger an additional premium under the worker's compensation policy, even if the policy covered only Olivas. However, the testimony at trial was clear that the six workers were not paid at the same rate. Olivas had greater skills than some of the other workers and was paid a larger share of the $190,000 than some of the other workers.

¶ 158. Olivas gave each of the workers a Form 1099 at the end of the year. The first box on the 2002 and 2003 1099 forms is for "Payer's name, street address, city, state, ZIP code, and telephone no." We do not have copies of these 1099s in the record, but Deb Seidel testified that she saw them. Olivas must have put his own name and address in the first box in order to show that he did not receive $193,644.17 in 2002 and $191,370.27 in 2003 as taxable income. When Tenpas gave Olivas a Form 1099, Tenpas would have filed that document with both the Internal Revenue Service and the Wisconsin Department of Revenue. Hence, Olivas had good reason to fill out the 1099s he issued to others in a way that showed *he* was paying out money. In the

eyes of an auditor like Deb Seidel, such entries would have firmed up Olivas's status as an employer of the workers, especially since Olivas could not produce certificates of insurance from the workers.

¶ 159. Olivas paid the workers each week after he received a check from Tenpas Drywall. Suppose, after putting his friends to work, he refused to pay them. Is there any question who the workers would have gone after for breach of contract? Weren't these workers "in service" under a "contract of hire, express or implied, oral or written"? *See* Wis. Stat. §§ 102.04(1)(e); 102.07(4)(a); 102.08(8)(a).

¶ 160. The logic and law of this dissent is amply supported by the testimony. Tenpas testified that he required all his subcontractors to obtain worker's compensation and liability coverage for their employees. Olivas acquired such policies, and he showed Tenpas certificates of insurance. The following excerpts from Olivas's own testimony show his intent:

Q And did Steve tell you that you should buy a workers' compensation policy?

A Steve told me that in order for him to be able to give me work, *we* needed to have a workmen's comp insurance.

. . . .

A I told him [the insurance agent] that *we* needed a policy for workmen's comp.

. . . .

Q . . . You bought a policy?

A Yes, *we* did buy it.

. . . .

Q And did you tell the insurance agent or salesman that you had a drywall company?

A No.

Q Did you tell him that you were a contractor?

A That *we* were a group of workers.

. . . .

Q Did you show him [Tenpas] the work comp policy before you started working for him?

A Yes. They require that in order for him to give *us* work. That is when I went to get that insurance.

. . . .

Q I think you testified that when you met with the insurance agent, you explained to him that you worked with a crew. Is there anything in your policy that talks about any of the other workers besides yourself?

A *I explained to them that we were a group of workers, and we were looking—we wanted workmen's comp insurance in order to work.* (Emphasis added.)

These many "we" and "us" references show that when Olivas purchased insurance policies, he was intending to obtain coverage for more than himself.

¶ 161. In my view, Olivas was an employer in fact and in law. He purchased worker's compensation and liability policies for himself and his crew. When he ultimately realized the full cost of the policies, he did not want to pay the premiums. He attempted to cancel the policies retroactively.

¶ 162. The majority opinion attempts to derail this analysis by determining, as a matter of law, that Olivas's five workers were simply not employees of Olivas. If this conclusion were correct, it would mean that if a worker like Jose Mireles had been injured, the

699

worker would have had to seek worker's compensation benefits from Tenpas or the fund, even though Olivas had a worker's compensation policy.

¶ 163. Arguably, the worker would not seek compensation from the fund because Tenpas would not be an "*uninsured* employer." Tenpas was insured. However, if the worker went after Tenpas, Tenpas would be citing the same law relied upon by the majority to exempt Olivas. *See, e.g., Kress Packing Co. v. Kottwitz,* 61 Wis. 2d 175, 212 N.W.2d 97 (1973); *Labor Ready, Inc. v. LIRC,* 2005 WI App 153, 285 Wis. 2d 506, 702 N.W.2d 27. *See also Wagner v. Continental Casualty Co.,* 143 Wis. 2d 379, 421 N.W.2d 835 (1988).

¶ 164. Tenpas would argue that he was more remote than Olivas and had less knowledge about and control over the workers than Olivas. One suspects that if Tenpas visited a job site and saw that the work was unsatisfactory, he had the authority to require changes. But one also suspects that if Olivas saw a worker doing a slipshod job, he could have intervened to correct the problem. Moreover, one suspects that if a worker's performance was consistently inadequate and undermined the position of the whole crew, Olivas would have taken steps to have him eliminated.

¶ 165. There is little or no evidence that Steve Tenpas exercised direct control over the workers. Tenpas paid Olivas the same way he would pay any subcontractor, that is, he would pay with a single check because he would not know the number of workers on a job or what they should be paid. Tenpas furnished drywall, but he did not furnish equipment or tools. Tenpas did not fire any worker. Presumably, he could have terminated Olivas or declined to give him additional jobs, but he never exercised that control over any of the workers.

¶ 166. Tenpas's relationship with Olivas's workers would not exist but for Olivas's assurance that he had worker's compensation and liability coverage for the workers, which he did. Sticking Tenpas with responsibility for a worker's injury, in spite of Olivas's insurance coverage, would wipe out Tenpas's statutory defense against liability and undo decades of worker's compensation law. It is simply mind boggling to believe that a worker like Mireles could be an employee of Tenpas but not of Olivas.

¶ 167. The majority is diverted from basic worker's compensation law by unproven notions about the exploitation of undocumented workers. As a result, it undercuts long-standing presumptions, *see* majority op. at ¶ 34, and creates uncertainty for employers, insurers, and workers. The majority's decision may force employers like Tenpas to bear responsibility for risks they took careful steps to avoid, and may force insurers to provide coverage of risks for which they have not been paid.

¶ 168. The alternative is to set certain workers adrift in a worker's compensation limbo. In my view, the statutes are not likely to be construed in a way that denies coverage for the workers. Somebody is going to have to pay.

¶ 169. For the reasons stated, I respectfully dissent.

¶ 170. I am authorized to state that Justices JON P. WILCOX and PATIENCE DRAKE ROGGENSACK join this opinion.