STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott Michael HARWOOD, Defendant-Appellant.

Court of Appeals

*No. 03–0049–CR. Submitted on briefs June 24, 2003.—
Decided September 17, 2003.*

2003 WI App 215

(Also reported in 671 N.W.2d 325.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Patrick J. Schott*, and *Margaret G Zickuhr*, of *Schott, Bublitz & Engel, S.C.* of Brookfield.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *David H. Perlman*, assistant attorney general.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. NETTESHEIM, J.  Scott Michael Harwood appeals from a judgment of conviction for maintaining a place to store controlled substances contrary to WIS.

STAT. § 961.42(1) and (2) (2001–02).[1] Harwood contends that the trial court erred in denying his motion to suppress evidence stemming from a warrantless police entry into his apartment. We uphold the trial court's ruling that exigent circumstances allowed the police to enter Harwood's apartment without a search warrant. We therefore affirm the judgment of conviction.

## FACTS

¶ 2. The facts underlying the police entry into Harwood's apartment are not disputed. Sergeant Michael Glider of the City of New Berlin Police Department testified at the suppression hearing that shortly after noon on May 19, 2002, he received a dispatch call of a burglary in progress at Apartment 206 of the Coachlight Apartments. The dispatcher reported that the tenant in Apartment 106 had observed two white males, "one boosting the other up to the window." The tenant believed the patio door to the apartment was being opened and the apartment was being entered illegally.

¶ 3. Glider was the first officer to respond to the call. Upon his arrival, he assigned other responding officers to perimeter positions around the building. While attempting to locate Apartments 206 and 106, Glider came upon two white males exiting Apartment 108. The two men closed the door quickly as if they "might be concealing something in 108." The men asked Glider why all of the officers were present and Glider replied that the tenant in 106 had seen another person boosting someone up onto the balcony of 206. The men responded that they were the two individuals the police

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version.

were looking for. One of the men, later identified as Harwood, indicated that he lived in 206, had locked himself out, and had enlisted the help of the other man, his neighbor Jeremy Van Hoorbeck, "to boost him up to the balcony to enter the balcony so he could get his keys."

¶ 4. When asked for identification, Van Hoorbeck produced a driver's license that did not have his Coachlight address. However, he was able to produce mail from his apartment bearing his name and his Coachlight address. Harwood was unable to provide identification but did provide his full name and date of birth. Van Hoorbeck informed Glider that Harwood occupied Apartment 206.

¶ 5. When Glider asked Harwood where his keys were, Harwood stated that he did not have them and they were still in his apartment. Glider noted that Harwood seemed very nervous and was sweating. In Glider's opinion, "things didn't seem to be adding up." A female occupant of Apartment 108 then came out to the hallway, produced a key ring and said the keys belonged to Harwood, but Glider also noted that the name on the buzzer next to Apartment 206 was "Virjonna," not Harwood. Therefore, based on Harwood's "nervousness, his sweatiness, [that he] said he didn't have the keys, then had them, the name at apartment 206 didn't match his name, [he] didn't have any identification, him only being 17," Glider doubted that Harwood actually lived in Apartment 206 and believed that a burglary may have occurred or may still be occurring.

¶ 6. Glider sent Officer Mark Herbst to check out Apartment 206. Herbst entered the apartment using the keys provided by the female from Apartment 108. During his visual inspection of the apartment, Herbst observed material that he believed to be controlled

substances and drug paraphernalia. After making sure that the apartment was clear, the police escorted Harwood into the apartment and asked him to produce verification that he lived there, including any mail with name and address. Harwood was unable to do so. The officers then attempted to contact the apartment manager.

¶ 7.  Another officer, Richard A. Helm Jr., testified at the suppression hearing regarding his contact with Harwood. According to Helm, he tried to corroborate Harwood's verbal identification by having Harwood produce evidence of his address, building number, and social security number. Harwood was unable to provide any of this information.

¶ 8.  Based on the totality of their investigation, the police obtained a search warrant for Harwood's apartment. The ensuing search revealed the drug-related evidence that resulted in the charge of maintaining a place .used for manufacturing, keeping or delivering controlled substances contrary to WIS. STAT. § 961.42(1) and (2).[2] Harwood filed a motion to suppress the evidence, contending that the police illegally searched his apartment without a search warrant. The trial court denied the motion, ruling that the officers' warrantless entry was justified under the circumstances.

¶ 9.  Harwood subsequently pled guilty to maintaining a place used for manufacturing, keeping or delivering controlled substances. The trial court withheld sentence and placed Harwood on probation for five

---

[2] Harwood was also charged with possession of marijuana pursuant to WIS. STAT. § 961.41(3g)(e), and possession of drug paraphernalia pursuant to WIS. STAT. § 961.573(1). These charges were dismissed pursuant to a plea agreement following the denial of Harwood's motion to suppress.

years with ten months' confinement as a condition of probation. Harwood appeals, challenging the circuit court's denial of his motion to suppress.

## DISCUSSION

¶ 10.  Appellate review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact, which we review under two different standards. *State v. Hughes*, 2000 WI 24, ¶ 15, 233 Wis. 2d 280, 607 N.W.2d 621. We will uphold the circuit court's findings of fact unless they are clearly erroneous; however, our application of the law to those facts presents a question of law, which we review de novo. *Id.*

¶ 11.  Although a police officer's warrantless entry into a private residence is presumptively prohibited by the Fourth Amendment to the United States Constitution, and article I, section 11, of the Wisconsin Constitution, the courts have recognized exceptions to the warrant requirement where the government can show both probable cause and exigent circumstances that overcome the individual's right to be free from government interference. *Hughes*, 233 Wis. 2d 280, ¶ 17. In this case, Harwood contends that there was neither probable cause nor exigent circumstances at the time of the search.

### *Probable Cause*

¶ 12.  In the search context, the quantum of evidence required to establish probable cause is a "fair probability" that contraband or evidence of a crime will

be found in a particular place. *Id.*, ¶ 21 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Harwood argues that the police did not have probable cause to believe that a crime was in progress when they entered his apartment or that evidence of a crime would be found in his apartment.

¶ 13. Harwood relies on our decision in *State v. Paterson*, 220 Wis. 2d 526, 583 N.W.2d 190 (Ct. App. 1998), in support of his argument. We first observe that *Paterson* was a community caretaker case. *Id.* at 529. The State made no claim that the police had probable cause to enter the residence, *id.* at 537, nor would the facts have supported a finding of probable cause. Therefore, we question the application of *Paterson* on this threshold basis.

¶ 14. Nonetheless, we address *Paterson*. There, the officers entered the residence based upon a dispatch report that a neighbor had called to report "suspicious activity at the residence and a possible burglary in progress." *Id.* at 529. The neighbor had reported "that there [were] lights going on and off in the upper level of the residence characteristic with somebody moving about from room to room . . . turning on lights momentarily, turning them off and proceeding to another room." *Id.* The neighbor had telephoned the Paterson residence and had received no response. *Id.* When the officers arrived at the residence they observed that the garage door was open and a pickup truck parked in the garage. *Id.* There was no sign of forced entry. *Id.* at 530. After attempting to contact the residence by telephone and announcing themselves at the residence with no response, the police entered the home to "see if there was something amiss." *Id.* In the course of inspecting the residence, the officers observed marijuana plants.

*Id*. We held that these circumstances did not authorize the police entry under the law of community caretaker. *Id*. at 538.

¶ 15.  Unlike the officers in *Paterson* who knew only that the lights in the residence had been turned on and off and nobody was answering the phone, the officers in this case had decidedly more suspicious information. Here, a resident of the apartment complex had reported a burglary in progress based upon his observation of one man boosting another onto the patio of an upper level apartment. The reporting resident did not identify either man as a resident of the apartment complex. When the police encountered Harwood and Van Hoorbeck in the building, Harwood appeared to be nervous and possibly concealing something in Van Hoorbeck's apartment. Although claiming to live in the apartment in question, Harwood could not recall the address of the apartment, could not recall his social security number, could not produce the keys to the apartment that he had just entered to retrieve, and his name did not match the name observed by the officers on the buzzer to the apartment. While a female occupant of Van Hoorbeck's apartment later produced keys and indicated they belonged to Harwood, the officers did not know the female occupant or her relationship to Harwood. Moreover, the female's production of Harwood's keys conflicted with Harwood's statement to the officers that his keys were in his apartment. We conclude that the totality of these observations established a "fair probability" that evidence of a crime would be found in Harwood's apartment. *See Hughes*, 233 Wis. 2d 280, ¶ 17 (citing *Gates*, 462 U.S. at 238).

¶ 16.  Harwood also contends that once the officers had him in custody, any probable cause that a crime was being committed or that a burglary was in progress

was eliminated. This argument, in part, is related to the exigent circumstances issue that we will address later. However, insofar as the argument bears on probable cause, it assumes that the police believed that any burglary involved only Harwood. But Glider's testimony is to the contrary. Based on Harwood's "nervousness, his sweatiness, [that he] said he didn't have the keys, then had them, the name at apartment 206 didn't match his name, [he] didn't have any identification, him only being 17," Glider doubted that Harwood lived in the apartment and "believed that a burglary may have occurred *or may still be occurring* up in 206." (Emphasis added.) Based on these suspicions, Glider concluded that it was necessary to "make sure that . . . there was nobody else in the apartment still burglarizing it."

■

¶ 17.  In deciding whether an officer's actions are permissible under the Fourth Amendment, we need only determine that the law enforcement action was reasonable under the circumstances. *Hughes*, 233 Wis. 2d 280, ¶ 23. Here, the officers testified that there was very little that occurred during their conversation with Harwood that gave them reason to believe his version of the events. Although Harwood makes much of the fact that the officers eventually entered the apartment with keys provided by him, it remains that, absent any identifying information, the officers had no way of knowing whether the keys were rightfully in his possession. Nor did the production of Harwood's keys by the female eliminate the reasonable possibility that a burglary was ongoing.

¶ 18.  Harwood also argues that the officers should have attempted to contact his apartment manager or check the license plate registration on his vehicle prior to entering the apartment. In support, Harwood again

relies on *Paterson*, a community caretaker case. One of the factors to be considered in assessing community caretaker activity is the availability and effectiveness of alternatives to intrusion. *Paterson*, 220 Wis. 2d at 533–34. However, *Paterson* did not involve a claim of probable cause, which requires a wholly different inquiry—whether there is a "fair probability" that contraband or evidence of a crime will be found in a particular place. *Hughes*, 233 Wis. 2d 280, ¶ 17 (citing *Gates*, 462 U.S. at 238). Here both Glider and Herbst testified that they were concerned with the possibility that a crime could be ongoing in Apartment 206. As discussed above, the facts within the officers' knowledge at the time of the entry supported that determination.

¶ 19.   Given the circumstances in this case, we conclude that the officers' actions were reasonable and supported by probable cause. We therefore turn to whether the State demonstrated that exigent circumstances existed to justify the warrantless entry into Harwood's apartment. *Hughes*, 233 Wis. 2d 280, ¶ 24 (once probable cause to search has been established, the State must also demonstrate exigent circumstances).

### Exigent Circumstances

¶ 20.   The existence of exigent circumstances is measured under an objective test. *Id*. This test inquires "whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of the suspect's escape." *Id*. Wisconsin courts recognize the following four circumstances which,

when measured against the time needed to obtain a warrant, constitute the exigent circumstances justifying a warrantless entry: (1) an arrest made in "hot pursuit," (2) a threat to the safety of a suspect or others, (3) a risk that evidence will be destroyed, and (4) likelihood that the suspect will flee. *Id.*, ¶ 25 (citing *State v. Smith*, 131 Wis. 2d 220, 229, 388 N.W. 2d 601 (1986)).

¶ 21. The State contends that the resident's report of a possible burglary in progress, and the observations made by the police, coupled with Harwood's responses to the police inquiries, created a sufficient exigency of possible escape or harm to others to justify a warrantless entry into Harwood's apartment. Harwood responds that there is no evidence of grave danger, risk of destruction of evidence, or escape because he was in handcuffs and being held by the officers. However, Harwood's argument again overlooks that the officers did not know at the time whether Harwood was involved in a burglary and, if so, whether he was acting alone.

¶ 22. Glider testified that after making contact with Harwood, he believed Harwood may have been a "co-conspirator." He sent officers to the apartment to "make sure there were no accomplices up there or somebody still burglarizing the apartment," and to check the patio doors for signs of forced entry because the officers could not see from the ground whether the door had been pried open. Herbst, the officer who first entered the apartment, stated that he entered to "make sure there was nobody else inside and to determine if there was a burglary in progress at that apartment." He made a visual "sweep" of the apartment during which he

checked those places where a person might conceal himself or herself. He did not open any cabinets, closets or drawers.

¶ 23.   The State cites to the supreme court's decision in *State v. Richter*, 2000 WI 58, 235 Wis. 2d 524, 612 N.W.2d 29, in support of its position that the officers in this case were faced with exigent circumstances. There, the court held that exigent circumstances justified a warrantless entry where an officer received a dispatch call which led him to believe that a burglary may be in progress; his response to the scene of the crime was immediate; he rapidly collected information regarding the whereabouts of the suspect; and his pursuit of the suspect was immediate and continuous upon his arrival on the scene. *Id.*, ¶¶ 36, 38.

¶ 24.   The facts confronting the police and the police reaction are similar to those of the officers in *Richter*. Glider received a dispatch to a possible burglary in progress. He arrived at Coachlight Apartments and organized police efforts to secure the building. He immediately entered the building in search of Apartment 206 and the suspect. Although Glider encountered Harwood while attempting to collect information about the suspect, as the State points out, this encounter did nothing to assuage Glider's concerns but rather exacerbated them.

██

¶ 25.   Harwood argues that the officers could have done more to ascertain his identity prior to entering the apartment. However, this argument overlooks that, at the time, the officers believed that a burglary was possibly in progress and therefore time was of the essence. By definition, exigent circumstances require a prompt response by officers. "[W]e do not apply hindsight to the exigency analysis; we consider only the

circumstances known to the officer at the time he [or she] made the entry and evaluate the reasonableness of the officer's action in light of those circumstances." *Id.*, ¶ 43. That Glider later discovered that Harwood did reside in Apartment 208 does not negate the exigency prior to ascertaining that information.

## CONCLUSION

¶ 26. We conclude that the officers' entry into Harwood's apartment was justified by both probable cause and exigent circumstances. We therefore uphold the trial court's order denying Harwood's motion to suppress and affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.