ACUITY MUTUAL INSURANCE COMPANY,
Plaintiff-Appellant,†

v.

Miguel A. OLIVAS, Defendant-Respondent.

Court of Appeals

*No. 2005AP685. Submitted on briefs November 29, 2005.
—Decided February 1, 2006.*

2006 WI App 45

(Also reported in 712 N.W.2d 374.)

---

† Petition to review granted 4-10-06.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Daniel J. Flynn* of *Kohner, Mann & Kailas, S.C.* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Ness Flores* and *Paul Bugenhagen Jr.* of *Flores & Reyes* of Waukesha.

Before Snyder, P.J., Brown and Nettesheim, JJ.

¶ 1. BROWN, J.   This case involves a dispute between an insurance carrier and one of its policyholders. Acuity Mutual Insurance Company increased Miguel A. Olivas' worker's compensation insurance premiums when it concluded that other workers who accompanied Olivas to his jobs were actually his employees. Olivas failed to pay these increased amounts, and Acuity sued. Acuity takes the position that we should treat this case like other worker's compensation cases. It concludes,

therefore, that Olivas had the burden of proving he was an independent contractor rather than an employee and that we should apply the Wis. Stat. § 102.07(8) (2003–04)[1] definitions of those terms. We disagree that worker's compensation law controls this case. That body of law applies to disputes between injured workers claiming they are entitled to compensation and employers (or the employers' insurance carriers) who dispute that they owe compensation benefits. Here, on the other hand, we have a run-of-the-mill breach of contract dispute about whether a policyholder owes certain premiums. The mere fact that the policy provides worker's compensation coverage does not change the nature of the dispute. We therefore affirm.

¶ 2. Roughly five years ago, Olivas approached Steve Tenpas, the owner of a drywall, contracting and painting business called Tenpas Drywall, looking for work as a subcontractor. Tenpas told Olivas that he only hired subcontractors who had worker's compensation and liability insurance. Olivas subsequently went to Schultz & Schultz, an insurance agent, to obtain an insurance policy per Tenpas' requirements. After Olivas obtained the Acuity policy, Tenpas hired him to do drywalling work.

¶ 3. Olivas does not do the jobs from Tenpas by himself. He has a group of non-English-speaking friends who work with him. Tenpas pays Olivas on a "per job" basis, calculating the amount earned for each job by the amount of square feet of drywall used on the job. When Olivas receives the check, he distributes to the other workers their shares of the money. At the end

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

of the tax year, Tenpas issues Olivas a 1099 form, and Olivas gives 1099 forms to each of the other workers.

¶ 4.  In April 2003, Acuity's senior premium auditor performed an audit of Olivas' account. Olivas had no records except for the 1099 forms. At that time, the auditor discovered that Olivas was working with several other subcontractors who did not have insurance certificates. The auditor concluded that these other crewmembers stood in an employer-employee relationship to Olivas, which would increase Acuity's exposure to liability. Accordingly, Acuity increased Olivas' premiums. Olivas did not pay these increased amounts, and the policy was eventually cancelled.

¶ 5.  On October 2, 2003, Acuity filed a complaint, demanding $32,192.30 in unpaid insurance premiums plus interest. It moved for summary judgment on December 8. Although the fate of that motion is not clear from the record, the case evidently proceeded to trial.

¶ 6.  The trial centered on the single issue of whether the individuals working with Olivas were employees or independent contractors. The distinction was apparently determinative of Olivas' liability for the additional premiums. Tenpas and the auditor testified for Acuity. Olivas and one of the other contractors testified on behalf of Olivas. The auditor took the stand first. She conceded that the determinative factor in reaching her conclusion that Olivas had an employer-employee relationship with the other workers was the fact that none of the others had compensation insurance coverage. She also considered that the crewmembers worked together, that they all did the same job, that Olivas obtained all of the jobs for the group, that Olivas issued 1099 forms to the rest of the crew, and that Tenpas paid Olivas only and not the other workers.

The auditor assumed because they worked together that Olivas must have been overseeing the others.

¶ 7. The major theme of Tenpas' testimony was that he interacts directly only with Olivas and has no control over the other members of Olivas' crew. According to Tenpas, he describes what needs to be done on a job to Olivas and pays only him for the job. He does not dictate how many people or which workers Olivas brings to any particular job, has never fired any of the other workers, and does not designate what hours the crew has to work or impose deadlines for projects. Tenpas also testified that he has no say in how much Olivas pays the other workers and could not confirm whether he pays them at all.

¶ 8. Olivas testified next. He characterized the crew as "a group of workers" in which each member works for his own account. "It is a group of Mexicans. We just kind of get together, and we all look for work . . . . We were looking for work, and that is how we met. We are friends, we look for work, we talk, and we go look for work." According to Olivas, the other workers do not communicate directly with Tenpas because they are undocumented aliens and do not speak English. Instead, Olivas obtains the assignments for the group. If a project is large, the group meets, and everyone agrees to bring in one more person. Olivas stated that he does not set hours for the other workers, tell them how to do the job, or otherwise supervise them, nor does he have the right to fire anyone from the group. Further, Olivas affirmed that all of the workers are responsible for bringing their own tools to the job.

¶ 9. He asserted that the group gathers when he receives payment from Tenpas and decides how to divide up the check. Experienced crewmembers receive larger shares than less experienced members of the

group. Olivas averred that he does not withhold any amounts for taxes and makes no profit when he divides the check. At the end of the tax year, he gets his 1099 form from Tenpas, and the group buys the rest of the 1099 forms that he gives to the other employees from OfficeMax.

¶ 10. The final witness was a member of Olivas' work group. This witness corroborated Olivas' characterization of his relationship to the other workers. He confirmed that Olivas obtains the jobs for the group due to the language barrier, that the group gets paid only when Olivas gets the check from Tenpas, and that the group divides the payment for each job, allocating each worker's share according to experience because the more experienced workers hang more drywall than the others. He also attested that Olivas does not withhold taxes from any worker's share and that he never knew Olivas to hold back any profits from the check. This witness further verified that Olivas did not regulate the other workers' hours, did not tell them how to hang the drywall, did not provide tools for any of the workers, and had no right to fire anyone from the group.

¶ 11. At the conclusion of the testimony, Acuity argued that it should prevail based on Wis. Stat. § 102.07(8), which includes independent contractors in its definition of "employee" unless the relationship between the worker and the employer meets all nine criteria listed in para. (b). Olivas stated that the common-law definition of "independent contractor" controlled. Without determining the applicability of the common-law definition, the trial court found, based on § 102.07(8)(b), that the other workers were independent contractors.

> I do find that each of these fellows owns their own equipment, each received a 1099 for tax purposes, each

performs work under their agreement. They agreed on how the compensation would be distributed. After the job is done, they are in fact paid pursuant to that agreement. Each is equally responsible to complete the job satisfactorily. Each runs the same risk of nonpayment, which admittedly is minimal, because they don't buy any of the supplies. The only risk would be nonpayment by Mr. Tenpas.

Accordingly, the court dismissed the complaint.

■

¶ 12. On appeal, Acuity does not appear to dispute the facts brought out in the trial testimony. Rather, its argument appears to be that the court did not properly assess these facts in light of Wis. Stat. § 102.07(8) and misallocated the burden of proof. In its brief, Acuity disputes the applicability of the common-law definition of "employee," and we initially had the impression that the court had employed that standard below. As it turns out, the court did apply the § 102.07(8) definition that Acuity advocates and simply disagreed that Acuity should prevail. Olivas responds that Acuity had the burden of proof and that § 102.07(8) does not control. Thus, we are left with questions of law, which we review de novo. *See Wolfe v. Wolfe*, 2000 WI App 93, ¶ 14, 234 Wis. 2d 449, 610 N.W.2d 222 (which party bears burden of proof and whether the party has met that burden are questions of law); *State v. Harwood*, 2003 WI App 215, ¶ 10, 267 Wis. 2d 386, 671 N.W.2d 325 (application of law to set of facts is a question of law); *Steven V. v. Kelley H.*, 2003 WI App 110, ¶ 29, 263 Wis. 2d 241, 663 N.W.2d 817 (determining what legal rules to apply presents a legal question), *aff'd on other grounds*, 2004 WI 47, 271 Wis. 2d 1, 678 N.W.2d 856.

¶ 13. We first address Acuity's argument that Olivas had the burden of proof. We acknowledge that in *Habrich v. Industrial Commission of Wisconsin*, 200 Wis. 248, 254, 227 N.W. 877 (1929), *abrogated in part by Scholz v. Industrial Comm'n of Wis.*, 267 Wis. 31, 65 N.W.2d 1 (1954), the supreme court stated that the employer had the burden of proof in worker's compensation cases because saddling workers with the burden of proving they are servants rather than independent contractors defeated the beneficent purpose of the worker's compensation laws by withdrawing the compensation the legislature intended the law to offer.

■

¶ 14. However, that is not what this case is really about. This case does not involve burdening the victim of an accident with the task of proving his or her entitlement to compensation. Rather, the complaint is that Olivas had an Acuity insurance policy under which he agreed to pay premiums and that he did not pay all of the required amounts. We see this case as a garden-variety breach-of-contract claim. In a breach of contract action, the plaintiff bears the burden of proving that the defendant violated the terms of the contract. *See Spielberg v. Harris*, 202 Wis. 591, 594–95, 232 N.W. 547 (1930).[2] Thus, the burden is not on Olivas to prove that his fellow workers were independent contractors. Instead, Acuity must prove that they were employees.

---

[2] Moreover, *Scholz v. Industrial Commission of Wisconsin*, 267 Wis. 31, 41a-41c, 65 N.W.2d 1 (1954), made clear that even in a worker's compensation case, the presumption of employee status disappears once the other party has adduced contrary evidence. Olivas presented both his own testimony and the testimony of a colleague.

¶ 15. We next consider Acuity's argument that the trial court improperly applied Wis. Stat. § 102.07(8) to the facts of this case. We note that Wis. Stat. ch. 102 is devoted entirely to the subject of worker's compensation. As we indicated above, this case is not about worker's compensation but rather involves an ordinary breach of contract. Thus, this court is not constrained by the narrow definition of "independent contractor" in § 102.07(8)(b).

¶ 16. The common law has long drawn a distinction between servants and independent contractors, and the historical definition is much broader than Wis. Stat. § 102.07(8)(b). The common law defines as an independent contractor "one who undertakes to do specific jobs of work, as an independent business, without submitting himself to control as to the petty details." *Madix v. Hochgreve Brewing Co.*, 154 Wis. 448, 451, 143 N.W. 189 (1913) (citation omitted). The predominant indicium of an independent contractor is whether the worker, rather than the employer, has the right to control the details of his or her performance. *Id.* The court may also consider lesser factors, such as the place of work, the duration of the employment, the method of payment, and whether the employer retains the right to discharge the worker. *Habrich*, 200 Wis. at 252. Courts are more likely to infer independent contractor status "where the contract calls for the performance of an entire piece of work at a specified price." *Id.*

¶ 17. We acknowledge that the trial court reached its result based on its application of Wis. Stat. § 102.07(8). Although it was not required to consider the factors in para. (b) of that statute, the common-law

definition of "independent contractor" certainly does not preclude courts from considering such other factors. Moreover, the trial testimony supports the existence of an independent contractor relationship between Olivas and the other workers based on the dominant "control" test. The unimpeached testimony of the defense witnesses established that Olivas does not control the time or method of the other workers' performance and has no right to discharge them. The auditor's opinion that he must have been overseeing the other workers was based predominantly on speculation. Her observations that Olivas obtained the jobs and received the money and that the workers all worked together at the same jobs were no more probative of an employer-employee relationship than an independent contractor relationship. The fact that the others lacked their own insurance policies, though indicative, was not conclusive. Moreover, Tenpas' affirmation that the other crew-members were not employees of Tenpas Drywall revealed nothing whatsoever about what kind of relationship they have with Olivas.

¶ 18.   Acuity failed to establish that the other workers were employees and not self-employed contractors who happened to work as a team with Olivas. Because Olivas was not obligated to pay additional premiums for independent contractors, it could not make out a prima facie case for breach of contract. The trial court therefore was correct to conclude that Olivas should prevail.

*By the Court.*—Order affirmed.