COURT OF APPEALS
DECISION
DATED AND FILED

May 15, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP58**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV32

IN COURT OF APPEALS
DISTRICT IV

---

JEFFREY E. RILEY, JEFFREY E. RILEY REVOCABLE TRUST,
CHERYL A. RILEY, AND CHERYL A. RILEY TRUST,

    PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,

 V.

PETRY TRUST NO. 1989,

    DEFENDANT-APPELLANT-CROSS-RESPONDENT.

---

    APPEAL from a judgment of the circuit court for Lafayette County: DUANE M. JORGENSON, Judge. *Reversed*.

    Before Graham, Nashold, and Taylor, JJ.

    **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Petry Trust No. 1989 ("Petry") appeals a judgment ordering Petry to pay over $1.2 million in damages for breaching a contract to buy 794 acres of farmland ("the Property") from Jeffrey E. Riley, the Jeffrey E. Riley Revocable Trust, Cheryl A. Riley, and the Cheryl A. Riley Trust (collectively, "the Rileys").[1] On appeal, Petry argues in relevant part that it did not breach the contract because it was authorized to terminate the contract when the Rileys refused to remove an easement from the title to the Property. The Rileys respond that they had no obligation to remove the easement from the title to the Property because Petry had breached the contract on two prior occasions.[2]

¶2 We conclude that Petry did not breach the contract to buy the Property because the Rileys waived Petry's prior breaches, and Petry was authorized by the terms of the contract to terminate the contract in response to the Rileys' refusal to remove the easement from the title to the Property. Therefore, we reverse.

## BACKGROUND

¶3 There is no dispute as to the following material facts.

---

[1] Jeffrey Riley and Cheryl Riley are in-laws related by marriage.

[2] Neither party's briefing complies with WIS. STAT. RULE 809.19(8)(bm) (2023-24), which addresses the pagination of appellate briefs. *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover"). This rule has recently been amended, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), and the reason for the amendment is that briefs are now electronically filed in PDF format, and are electronically stamped with page numbers when they are accepted for efiling. As our supreme court explained when it amended the rule, the new pagination requirements ensure that the numbers on each page of a brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief. Supreme Court Note, 2021, RULE 809.19.

All references to the Wisconsin Statutes are to the 2023-24 version.

¶4 In early 2020, the Rileys decided to sell the Property, which consisted of 794 acres of farmland in Lafayette County and Iowa County. The Rileys scheduled an auction for April 2, 2020, and set the "Reserve Selling Price" at $5 million. This meant that the auction company was authorized to sell the Property to the highest bidder if the bidding reached $5 million, but the Rileys could decline to sell the Property if the bidding did not reach that price.

¶5 On March 5, 2020, less than one month before the scheduled auction, Petry sent the Rileys an "Offer to Purchase" the Property for $6 million. In relevant part, the Offer to Purchase required the parties to close on the transaction by April 1, 2020, and required Petry to pay $25,000 in earnest money to the Rileys within five days of the acceptance of the Offer to Purchase. The Offer to Purchase also required the Rileys to convey "merchantable title" to the Property. The "merchantable title" provision created the following set of mutual obligations. Within 15 days after acceptance of the Offer to Purchase, the Rileys were required to provide Petry with evidence of title to the Property in the form of a "title insurance commitment." If the title was not "acceptable for closing"— meaning that the title was not "free and clear of all liens and encumbrances," with certain exceptions not relevant here—then Petry was required to notify the Rileys in writing of its objections to the title within 15 days of receiving the title insurance commitment. Within five days of receiving Petry's title objections, the Rileys were required to notify Petry of their "election to remove the objections by the time set for closing." If the Rileys failed to provide such notice and Petry declined to waive the objections, then Petry was required to "deliver written notice of termination and th[e] Offer shall be null and void."

¶6 On March 6, the day after Petry sent the Rileys the Offer to Purchase, the Rileys sent Petry a "Counteroffer" that incorporated the entire Offer

to Purchase and modified certain terms and conditions. In relevant part, the Counteroffer increased the amount of earnest money owed by Petry to $600,000 and gave Petry 14 business days to "conduct [its] own title search or review [the Rileys'] Title commitment."

¶7 Petry signed the Counteroffer on March 6, the same day it was sent. We refer to the Offer to Purchase, as modified by the Counteroffer, as "the Purchase Agreement." As a result of the signed Purchase Agreement, Petry was required to provide the Rileys with $600,000 in earnest money by March 11, 2020, and the Rileys were required to provide a "title insurance commitment" by March 21, 2020, which would show any liens or encumbrances on the Property.[3]

¶8 On March 8, 2020, two days after Petry signed the Purchase Agreement, Petry sent a letter to the Rileys that purported to withdraw from the Purchase Agreement. In relevant part, this letter stated: "Please be advised that due to unforeseen circumstances relating to the pending 1031 exchange Petry … will be unable to complete the purchase of the above property. The purchase agreement is hereby withdrawn." Petry did not pay the $600,000 in earnest money that was due on March 11.

¶9 On March 10, the Rileys sent Petry a title insurance commitment (the "Title Commitment") that disclosed dozens of "exceptions" to the Rileys' title to the Property.[4] In relevant part, the Title Commitment disclosed the existence of

---

[3] The Rileys also sent Petry a "vacant land disclosure report" with the Counteroffer. Because this report is not germane to our analysis in this opinion, we do not discuss it further.

[4] In total, there were 29 "exceptions" disclosed on the Title Commitment, including easements, mortgages, liens, land contracts, mineral rights, utility easements, potential lack of access to certain parcels, and possible encroachments on the Property.

an ingress/egress easement that was created in 2006 and encumbered the Property for the benefit of land owned by Alfred Berrey ("the Berrey Easement").

¶10     On March 19, Petry sent the Rileys a letter objecting to 14 of the exceptions noted in the Title Commitment, including the Berrey Easement.  In its letter, Petry stated that, pursuant to the Purchase Agreement, "the Rileys have five days to notice their intent to remove the objections by the time set for closing: April 1, 2020.  If notice is not provided as required or the objections are not removed by April 1, 2020, Mr. Petry considers the contract terminated."  As noted, the Purchase Agreement stated that the Rileys must provide notice of their intent to remove any objections to the title within five days of receiving such objections.

¶11     Five days later, on March 24, the Rileys sent a letter to Petry saying that Petry's objections to the Title Commitment were "unfounded and without merit."  In relevant part, the letter rejected Petry's objection to the Berrey Easement, alleging that the Rileys had previously disclosed that easement to Petry.  On appeal, the Rileys do not dispute that this statement in their letter was incorrect, nor do they dispute that they never disclosed the Berrey Easement to Petry before sending the Title Commitment.  As a result, the Rileys did not give Petry notice of their intent to remove the Berrey Easement (or most of the other title objections) within the five-day period required by the Purchase Agreement, nor did they remove the Berrey Easement by the date scheduled for closing.  The closing date came and went, but Petry did not purchase the Property.

¶12     The Rileys eventually sold 469 acres of the Property at auction and in private sales in May and June 2020 for just under $3.3 million.  The Rileys retained the remaining portion of the Property.

¶13    In April 2020, the Rileys sued Petry for breach of contract based on Petry's withdrawal from the Purchase Agreement in its March 8 letter and Petry's failure to pay the required $600,000 in earnest money by March 11. In relevant part, Petry responded that it did not breach the contract because it properly terminated the Purchase Agreement when the Rileys failed to correct Petry's objections to the Title Commitment.

¶14    The circuit court held a three-day trial on these issues, at which the parties presented the testimony of Jeffrey Petry (trustee of the Petry Trust), Jeffrey Riley, Cheryl Riley, and other individuals involved in the transaction. In its post-trial brief, Petry argued in relevant part that the Rileys waived their right to argue that Petry breached the contract because they continued to treat the Purchase Agreement as intact after both of Petry's alleged breaches. Specifically, Petry argued that the Rileys waived Petry's March 8 withdrawal from the Purchase Agreement because the Rileys sent Petry the Title Commitment on March 10, responded to Petry's title objections in their March 24 letter, and continued to demand Petry's performance under the Purchase Agreement. Petry also argued that the Rileys waived Petry's failure to pay the earnest money by the March 11 deadline because their March 24 letter responded to Petry's title objections and said that they still considered the Purchase Agreement to be binding. In their post-trial brief, the Rileys argued in relevant part that they did not waive either of Petry's breaches.

¶15    In an oral ruling, the circuit court concluded that Petry breached the Purchase Agreement by withdrawing from the Purchase Agreement on March 8, 2020. In relevant part, the court found that Petry did not know about any title issues (including the Berrey Easement) at the time it purported to withdraw from the Purchase Agreement. Instead, the court found that Petry withdrew from the

Purchase Agreement pursuant to its March 8 letter due to a failed "1031 property exchange," even though the Purchase Agreement did not allow for Petry to withdraw on that basis. Additionally, the court determined that, even if Petry had intended to withdraw due to issues with the title, Petry's withdrawal still would not be valid because all of the easements listed on the Title Commitment (including the Berrey Easement) had been extinguished under the doctrine of merger. *See Kallas v. B & G Realty*, 169 Wis. 2d 412, 419-20, 485 N.W.2d 278 (Ct. App. 1992) (an easement is extinguished by merger when the dominant and servient estates are owned by the same person). Notably, the court did not explicitly address Petry's argument that the Rileys waived Petry's alleged breaches of the Purchase Agreement.

¶16 Petry filed a reconsideration motion arguing that the circuit court erroneously applied the merger doctrine because the Berrey Easement was never under common ownership. In light of this error, Petry asked the court to address the arguments about waiver that Petry raised in its post-trial brief. The Rileys agreed that the Berrey Easement was not extinguished by merger. Nonetheless, the Rileys argued that the court's decision was unaffected by the existence of the Berrey Easement because that easement did not change the court's determination that Petry improperly withdrew from the Purchase Agreement on March 8, before Petry learned about the Berrey Easement. The Rileys also argued that, if Petry had withdrawn due to issues with the title, it was required to give the Rileys an opportunity to correct those issues before it withdrew.

¶17 In an oral ruling, the circuit court denied Petry's reconsideration motion. The court acknowledged that the Berrey Easement was not extinguished by the merger doctrine. However, the court concluded, without reference to any legal authority or to the text of the Purchase Agreement, that the Berrey Easement

7

did not affect its ruling because that easement was not material to the Purchase Agreement and did not impair the value of the Property. Again, the court did not address Petry's argument that the Rileys waived Petry's alleged breaches of the Purchase Agreement.

¶18 After the circuit court had concluded that Petry breached the Purchase Agreement, the court held a trial on the issue of damages. In its final judgment, the court found that Petry owed over $1.2 million in damages to the Rileys.

¶19 Petry appeals the circuit court's final judgment. The Rileys cross-appeal the final judgment with respect to one item of damages concerning the unsold portion of the Property that the court declined to award.

## DISCUSSION

¶20 As pertinent to this appeal, Petry argues that it is not liable to the Rileys for breach of contract because Petry validly terminated the Purchase Agreement when the Rileys failed to provide notice of their intent to remove the Berrey Easement from the title to the Property. The Rileys argue that they had no obligation to address Petry's title objections because Petry had previously breached the Purchase Agreement by sending its March 8 letter withdrawing from the Purchase Agreement and by failing to pay the earnest money by March 11.

¶21 With respect to Petry's arguments that the Rileys waived Petry's alleged breaches of the Purchase Agreement, we repeat our observation that the circuit court never directly addressed that argument. However, we also note that the facts that Petry cited in the circuit court to support its waiver argument are undisputed. Although waiver ordinarily presents questions of fact, we review

waiver as a question of law when the facts are undisputed. *See **All Star Rent A Car, Inc. v. DOT***, 2006 WI 85, ¶15, 292 Wis. 2d 615, 716 N.W.2d 506; ***Thompson v. Village of Hales Corners***, 115 Wis. 2d 289, 319, 340 N.W.2d 704 (1983). We uphold factual findings unless they are clearly erroneous, but we review questions of law independently. ***Royster-Clark, Inc. v. Olsen's Mill, Inc.***, 2006 WI 46, ¶¶11-13, 290 Wis. 2d 264, 714 N.W.2d 530.

¶22 We conclude that the undisputed facts in the record establish that the Rileys waived Petry's alleged contract breaches, and therefore, that Petry validly terminated the Purchase Agreement when the Rileys refused to remove the Berrey Easement from the title to the Property. Accordingly, we reverse the judgment of the circuit court.[5]

---

[5] Petry also argues on appeal that it was entitled to rescind the Purchase Agreement under WIS. STAT. § 709.05 because the Rileys failed to provide Petry with a complete copy of a "vacant land disclosure report." However, we do not address this argument because our conclusion regarding the Rileys' failure to remove the Berrey Easement from the title to the Property is dispositive. *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

Petry also mentions in one sentence of its brief that the circuit court failed to address Petry's claims regarding material misrepresentation and unclean hands. However, Petry does not elaborate on these arguments or otherwise explain why these claims are significant. We decline to address these undeveloped arguments. *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

The parties also dispute the circuit court's award of damages. Petry argues that the circuit court erred in awarding several items of damages. The Rileys concede that the court erroneously awarded one item of damages concerning auction costs (thereby requiring at least a partial reverse), and they argue in their cross-appeal that the court erroneously declined to award a separate item of damages concerning the unsold portion of the Property. We need not address these arguments because our conclusion that Petry did not breach the Purchase Agreement means that the Rileys are not owed damages. Therefore, we also reverse to the extent that the circuit court awarded damages to the Rileys.

## I. Standard of Review

¶23     "The elements of any breach of contract claim are (1) the existence of a contract between the plaintiff and the defendant; (2) breach of that contract; and (3) damages." ***Pagoudis v. Keidl***, 2023 WI 27, ¶12, 406 Wis. 2d 542, 988 N.W.2d 606. "In a breach of contract action, the plaintiff bears the burden of proving that the defendant violated the terms of the contract." ***Acuity Mut. Ins. Co. v. Olivas***, 2006 WI App 45, ¶14, 289 Wis. 2d 582, 712 N.W.2d 374, *aff'd*, 2007 WI 12, 298 Wis. 2d 640, 726 N.W.2d 258. However, if the defendant raises an affirmative defense to the breach of contract claim (such as waiver), then the defendant has the burden of proving the affirmative defense. ***Scherg v. Puetz***, 269 Wis. 561, 564, 69 N.W.2d 490 (1955). "In most civil cases, the lowest, ordinary burden of proof applies, requiring what is commonly referred to as a 'preponderance of the evidence.'" ***Marquez v. Mercedes-Benz USA, LLC***, 2012 WI 57, ¶37, 341 Wis. 2d 119, 815 N.W.2d 314, *decision clarified on denial of reconsideration*, 2012 WI 74, 342 Wis. 2d 254, 823 N.W.2d 266. Here, the parties do not dispute that the "preponderance of the evidence" burden of proof applies to the claims at issue.

¶24     In order to determine whether a breach of the Purchase Agreement occurred, we must interpret the language of the Purchase Agreement. The interpretation of an unambiguous contract presents a question of law. ***Tufail v. Midwest Hosp., LLC***, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586. When interpreting contracts, "our goal 'is to ascertain the true intentions of the parties as expressed by the contractual language.'" ***Town Bank v. City Real Est. Dev., LLC***, 2010 WI 134, 330 Wis. 2d 340, ¶33, 793 N.W.2d 476 (citation omitted). "Contract language is construed according to its plain or ordinary meaning, … consistent with 'what a reasonable person would understand the words to mean

under the circumstances.'" *Tufail*, 348 Wis. 2d 631, ¶28 (citation omitted). "Where the terms of the contract are clear and unambiguous, we construe the contract according to its literal terms." *Id.*, ¶26.

## II. Petry Validly Terminated the Purchase Agreement

¶25 As noted, Petry argues that it was authorized to terminate the Purchase Agreement when the Rileys refused to remove the Berrey Easement from the title to the Property after Petry objected to that easement. We review and expand on the pertinent facts to provide context for the parties' arguments.

¶26 As noted, on March 10, 2020, two days after Petry purported to withdraw from the Purchase Agreement, the Rileys sent Petry the Title Commitment for the Property that disclosed the Berrey Easement and many other exceptions to title. In response, Petry sent the Rileys a letter on March 19 objecting to the Berrey Easement as well as several other exceptions on the Title Commitment. In its letter, Petry referred to a portion of the Purchase Agreement that gave the Rileys five days to "deliver notice to [Petry] stating [the Rileys'] election to remove the objections [to the title exceptions] by the time set for closing," otherwise Petry would be authorized to provide "written notice of termination" and the Purchase Agreement would be "null and void." Petry also stated that, "[i]f notice is not provided as required or the objections are not removed by April 1, 2020, … Petry considers the contract terminated." Five days later, on March 24, the Rileys sent Petry a letter stating that they considered most of Petry's objections "unfounded and without merit," although they agreed to correct a "mineral rights reservation" that was erroneously included on the Title Commitment. With respect to the Berrey Easement, the Rileys stated that they had previously disclosed this easement to Petry, although the Rileys now do not

11

dispute that this portion of their March 24 letter was incorrect. The Rileys' letter also said that Petry breached the Purchase Agreement by failing to pay the earnest money by March 11, but that the Rileys still wanted Petry to pay the earnest money and to close on the transaction.

¶27 On appeal, Petry argues that it was authorized to terminate the Purchase Agreement pursuant to its terms because the Rileys failed to timely remove the Berrey Easement from the title to the Property. The Rileys do not dispute that they failed to remove the Berrey Easement. The Rileys also do not challenge Petry's assertion that, if they were contractually obligated to timely remove the Berrey Easement, then their failure to do so renders the Purchase Agreement null and void, and that Petry's termination of the Purchase Agreement, if valid, would absolve Petry of liability for breaching the Purchase Agreement. Instead, the Rileys' only argument is that they had no obligation to remove the Berrey Easement because Petry had breached the Purchase Agreement when it withdrew from the Purchase Agreement on March 8 and failed to pay the earnest money by March 11.[6]

¶28 We reject the Rileys' argument. As explained in more detail next, we conclude that Petry's March 8 withdrawal letter and Petry's failure to pay the

---

[6] On appeal, we note that the Rileys do not cite to any legal authority to support their argument that they were relieved of their contractual obligations under the Purchase Agreement because of Petry's alleged breaches of the Purchase Agreement. Arguments in appellate briefs must be supported by citations to legal authority, WIS. STAT. RULE 809.19(1)(e) & (3)(a), and we need not consider arguments that fail to do so or are not sufficiently developed, *Pettit*, 171 Wis. 2d at 646-47. The Rileys may have intended to support this proposition with the same citations to legal authority and theories that they raised in the circuit court—*i.e.*, that the doctrines of "anticipatory breach" and "material breach" relieved them of their future contractual obligations under the Purchase Agreement. Accordingly, we analyze Petry's March 8 withdrawal under the doctrine of "anticipatory breach," and we analyze Petry's failure to pay the earnest money under the doctrine of "material breach."

earnest money by March 11 did not relieve the Rileys of their remaining contractual obligations because the undisputed facts establish that the Rileys waived both of those alleged breaches. Therefore, we conclude that Petry was authorized to terminate the Purchase Agreement because of the Rileys' failure to remove the Berrey Easement title exception to which Petry objected.[7]

### A. Petry's March 8 Withdrawal

¶29 As noted, the first issue we must address is whether Petry's March 8 withdrawal letter relieved the Rileys of their obligation to remove the Berrey Easement from the title to the Property after Petry objected. When, as here, one party to a contract repudiates—*i.e.*, refuses to fulfill—their contractual obligations before the time for performance of those obligations, that repudiation may constitute an "anticipatory breach." *Menako v. Kassien*, 265 Wis. 269, 273, 61 N.W.2d 332 (1953). In this situation, the non-breaching party may have the option of treating the contract as terminated. *Id.* A party's repudiation of the contract does not automatically relieve the non-breaching party of its contractual obligations. First, in order for the non-breaching party to treat the contract as terminated, the non-breaching party must show that the repudiating party's refusal to fulfill their contractual obligations was "definite and unequivocal." *Wisconsin Dairy Fresh, Inc. v. Steel & Tube Prods. Co.*, 20 Wis. 2d 415, 427, 122 N.W.2d 361 (1963). Second, even if the repudiating party unequivocally refuses to fulfill their future contractual obligations, the non-breaching party must also give some

---

[7] The Rileys do not challenge Petry's assertion that it gave notice in its March 19 letter that the purchase agreement would be terminated if the Rileys failed to timely remove its objection to the Berrey Easement. Therefore, we assume without deciding that Petry gave sufficient notice of the termination of the Purchase Agreement.

indication to the breaching party that the non-breaching party considers the contract to be terminated. *Young v. Grosnick*, 256 Wis. 225, 233, 40 N.W.2d 382 (1949). If the non-breaching party still considers the contract to be in force and insists upon performance of the contract despite the repudiation, then the non-breaching party will be deemed to have waived their right to treat the repudiation as an anticipatory breach. *Id.* In other words, the non-breaching party "cannot treat the repudiation both as a breach and as no breach at the same time." *Id.* at 232.

¶30 For example, in *Young*, the Youngs entered into a contract to purchase a farm from the Grosnicks. *Id.* at 226. One of the conditions in the contract was that the Grosnicks needed to deliver a deed to the Youngs by July 1. *Id.* Several days after signing the contract, the Grosnicks told the Youngs that they did not want to complete the sale until they had a chance to talk with their son on July 3. *Id.* at 227-28. In response, the Youngs told the Grosnicks that they were considering two options: treating the contract as terminated; or waiting until the Grosnicks were ready to complete the sale. *Id.* at 228. On June 27, the Youngs' attorney indicated that the Youngs were still seeking to complete the sale. *Id.* at 228-29. On July 2, the Youngs informed the Grosnicks that they considered the contract terminated because the Grosnicks failed to deliver the deed by July 1, and they later sued the Grosnicks for breach of contract. *Id.* at 229. Our supreme court concluded that the Youngs' conduct waived any anticipatory breach by the Grosnicks because the Youngs did not indicate until July 2 that they considered the contract to be terminated. *Id.* at 230. Instead, the Youngs' communications to the Grosnicks indicated that the Youngs "were willing to wait until July 3 … to see whether the transaction would go through or not." *Id.* at 231. These

communications also indicated that the Youngs considered the contract to be "in full force and effect" and "binding throughout the [relevant] period." *Id.* at 233.

¶31    Here, as noted, the Rileys argue that Petry's March 8 letter was an anticipatory breach of the Purchase Agreement.  To repeat, this letter stated: "Please be advised that due to unforeseen circumstances relating to the pending 1031 exchange Petry … will be unable to complete the purchase of the above property.  The purchase agreement is hereby withdrawn."  Assuming without deciding that this letter was a "definite and unequivocal" refusal by Petry to fulfill its future obligations under the Purchase Agreement, *see Wisconsin Dairy Fresh*, 20 Wis. 2d at 427, we conclude that the Rileys waived any anticipatory breach by continuing to treat the Purchase Agreement as in force and insisting that Petry perform its obligations.  For example, Jeffrey Riley testified at trial that he decided to "continue on like normal" after receiving Petry's March 8 letter because he "thought the contract might be binding, and [Petry] would come through yet."  Moreover, the Rileys' communications to Petry gave no indication that the Rileys considered the Purchase Agreement to be terminated.  For example, on March 8, the Rileys' real estate agent emailed Petry's real estate agent asking for an explanation of Petry's withdrawal and saying: "We expect the earnest money to be deposited into the account by Wednesday, per contract."  The next day, March 9, the Rileys' real estate agent ordered the Title Commitment from the title company and sent the Title Commitment to Petry's agent on March 10.  Two days later, on March 12, the Rileys' real estate agent sent a follow-up email to Petry's agent stating, in part: "Please let your client know that … [Jeffrey Riley's] bank, the mortgage holder of his land, is preparing their releases of the parcels that are outlined in the offer to purchase.  I assume you have received all the title work sent to you Tuesday."

15

¶32    These written communications, actions by the Rileys' agents, and Jeffrey Riley's testimony show that the Rileys considered the Purchase Agreement to remain in force and continued to insist that Petry perform its obligations despite Petry's March 8 withdrawal letter.  Therefore, we conclude that the Rileys waived any anticipatory breach that resulted from Petry's March 8 withdrawal letter.

### B.  Petry's Failure to Pay Earnest Money by March 11

¶33    Second, we must consider whether Petry's failure to pay the required $600,000 in earnest money by March 11 was a material breach that relieved the Rileys of their obligation to remove the Berrey Easement from the title to the Property.[8]  "It is well established that a material breach by one party may excuse subsequent performance by the other."  *Management Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 183, 557 N.W.2d 67 (1996).  "However, a party is not automatically excused from future performance of contract obligations every time the other party breaches."  *Id.*  First, the breach must be "material," meaning that "there must be so serious a breach of the contract by the other party as to destroy the essential objects of the contract."  *Id.* (citation omitted).  Second, even if the breach is material, "the non-breaching party may waive the claim of materiality through its actions."  *Id.* at 183-84.  "For example, a non-breaching party may waive the materiality by continuing to live with the contract as if it existed."  *Id.* at 184 n.25.

---

[8]  Unlike Petry's March 8 letter—which we analyzed under the principles of "anticipatory breach" because Petry sent that letter before the deadline for Petry's performance of its obligations under the Purchase Agreement—we analyze Petry's failure to pay the earnest money by the March 11 deadline under the principles of "material breach" because Petry did not pay the earnest money by the deadline required by the Purchase Agreement.

¶34 Here, the Rileys argue that Petry's failure to pay the earnest money by March 11 was a material breach of the Purchase Agreement because the Purchase Agreement provides, with respect to the earnest money payment, that "Time is of the Essence" and that "failure to [pay the earnest money] by the exact date or Deadline is a breach of contract." Assuming without deciding that Petry's failure to pay the earnest money by March 11 was a material breach, we conclude that the Rileys waived the materiality of the March 11 deadline because the Rileys continued to act and correspond with Petry in a manner that indicated that they were proceeding with the Purchase Agreement. For example, Jeffrey Riley testified at trial that he still considered the Purchase Agreement to be binding and still wanted to proceed to closing despite Petry's failure to pay the earnest money on March 11. Moreover, the Rileys' communications to Petry indicated that they were continuing to live with the Purchase Agreement despite Petry's failure to pay the earnest money on March 11. In the Rileys' March 24 letter responding to Petry's title objections, the Rileys asked Petry to "send the earnest money forthwith to the title company" and said that they still "look[] to close on this transaction on April 1st." This language indicates that the Rileys did not consider Petry's failure to pay earnest money by the March 11 deadline to have terminated the Purchase Agreement and the Rileys' obligations under it. As another example, the fact that the Rileys removed a "mineral rights reservation" from the Title Commitment at Petry's request indicates that the Rileys believed they continued to have contractual obligations to Petry.

¶35 Based on their actions, correspondence, and testimony just discussed, we conclude that the Rileys considered the Purchase Agreement to still be in effect and still expected the closing to occur on April 1 as planned. Because the Rileys continued to expect Petry to abide by the terms of the Purchase

Agreement, the Rileys too must hold themselves to the same expectation in honoring their contractual obligation, as specifically set forth in the Purchase Agreement, to clear the title to the land if Petry objected to a title exception. The Rileys failed to live up to their end of the bargain while still expecting that Petry do so. Therefore, we conclude that the Rileys were not absolved of their own contractual obligations to Petry, which they violated when they refused to communicate an intent to remove the Berrey Easement from the title to the Property and, in fact, failed to do so prior to the April 1 closing date.

¶36 In sum, we conclude that the Rileys waived Petry's March 8 withdrawal from the Purchase Agreement and Petry's failure to pay the earnest money by the March 11 deadline. As a result, the Rileys remained contractually obligated to remove the Berrey Easement from the title to the Property when Petry objected to that title exception. Because the Rileys did not give notice of their intent to remove the Berrey Easement within five days of Petry's objection, and in fact, did not remove the Berrey Easement prior to the April 1 closing date, we conclude that Petry was authorized to terminate the Purchase Agreement if the Berrey Easement exception to title was not timely resolved, an option that Petry elected to take, as communicated to the Rileys in its March 19 letter. When this exception to title was not timely resolved, the Purchase Agreement, by its own terms, became "null and void." Therefore, we conclude that Petry is not liable to the Rileys for breach of contract and does not owe Petry any damages.

## CONCLUSION

¶37 For the foregoing reasons, the judgment of the circuit court is reversed.

*By the Court.*—Judgment reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.